**NUCLEAR REGULATORY COMMISSION, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

**National Treasury Employees Union, Intervenor.**

No. 87–3182.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1988.

Decided Oct. 5, 1988.

---

303

Dennis C. Dambly, Deputy Asst. Gen. Counsel for Admin. (William H. Briggs, Jr., Sol., E. Leo Slaggie, Deputy Sol., Marvin L. Itzkowitz, Sr. Counsel for Labor and Personnel, Mary K. Hembree, Office of the Gen. Counsel, U.S. Nuclear Regulatory Com'n, Washington, D.C., on brief), for petitioner.

Jill A. Griffin (Ruth E. Peters, Sol., William E. Persina, Deputy Sol., Federal Labor Relations Authority, Washington, D.C., on brief), for respondent.

Gregory O'Duden, Deputy Director of Litigation (Lois G. Williams, Director of Litigation, National Treasury Employees Union, Washington, D.C., on brief), for intervenor.

Before PHILLIPS and SPROUSE, Circuit Judges, and KAUFMAN, Senior United States District Judge for the

District of Maryland, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

The Nuclear Regulatory Commission (NRC) is before this court on a petition for review of a bargaining order of the Federal Labor Relations Authority (FLRA). The FLRA has cross-petitioned for enforcement of its order and the National Treasury Employee's Union (NTEU) has been permitted to intervene. We have jurisdiction over the NRC's petition for review and the FLRA's cross-petition for enforcement under § 7123 of the Federal Service Labor–Management Relations Statute, Title VII of the Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 7123 (1982). In its order, the FLRA found that the NRC was obligated under 5 U.S.C. § 7102(2) to bargain in good faith over a salary proposal advanced by the NTEU during collective bargaining. We agree. Accordingly, we deny the petition for review, affirm the decision of the FLRA, and grant the cross-petition for enforcement of the FLRA's bargaining order.

## I

The NTEU is the exclusive representative of all nonmanagerial, nonsupervisory, and nonconfidential professional, nonprofessional and wage-grade employees of the NRC. In October 1984, during collective bargaining, the NTEU presented the following proposal to the NRC:

Section 52.1

The salary structure, that is the grade and steps of the pay schedule, being used by the NRC will be maintained. Hereafter, all employees will have their current salaries adjusted for the cost of living/comparability factor. The adjustment will be equal to the statistical adjustment recommended to the President by the Pay Advisory Council.[1]

This adjustment will become effective at the beginning of the first pay period following the announcement of it by the

Council or other appropriate sources. It will be unaffected by Presidential or Congressional actions.

Section 52.2

NTEU agrees to establish with the employer a productivity committee that will monitor the impact of the new salary adjustment system and seek reasonable ways to increase the productivity of the employer, e.g., decrease employee turnover, remove work obstacles, improve upon available machines and procedures, and raise employee morale.

The NRC refused to bargain and served the NTEU with a written allegation of nonnegotiability, *see* 5 U.S.C. § 7117(c), on October 5, 1985. The NTEU, however, did not until February 25, 1986, formally request a written allegation of nonnegotiability regarding the proposal which the NRC then again provided the NTEU on March 6, 1986. On March 20, 1986, the NTEU filed a petition for review of the NRC's nonnegotiability determination, pursuant to 5 U.S.C. § 7117.

Before the FLRA, the NRC asserted several grounds for its refusal to bargain over the NTEU's proposal. First, the NRC argued that the NTEU's petition for review was untimely under 5 U.S.C. § 7117(c) because that provision required the petition for review to be filed within 15 days of the NRC's original written allegation of nonnegotiability.

On the merits, the NRC argued that the NTEU's proposal is nonnegotiable because it is "inconsistent with Federal law," 5 U.S.C. § 7117(a), namely with § 161(d) of the Atomic Energy Act of 1954 (AEA), 42 U.S.C. § 2201(d), which, in pertinent part, provides that the NRC's employees' compensation is to be

fixed in accordance with [the Classification Act of 1949, as amended] chapter 51 and subchapter III of chapter 53 of Title 5, except that, to the extent the Commission deems such action necessary to the discharge of its responsibilities, personnel may be employed and their compensation fixed without regard to such laws.

---

1. The FLRA concluded and the parties agree that by "Pay Advisory Council" the proposal is referring to the Advisory Committee on Federal Pay, functioning pursuant to 5 U.S.C. § 5306.

*Id.* Alternatively, the NRC contended that Congress never intended federal employees wages to be negotiable "conditions of employment" under §§ 7102(2) and 7103(a)(14) of the CSRA and that such matters are, generally, nonnegotiable "unless a given statute clearly indicates to the contrary." The absence of such a statute with regard to the NRC's employees, it was argued, rendered their salaries nonnegotiable under the general rule. Finally, the NRC contended that the NTEU's proposal conflicted with the NRC's "management right" to determine its budget, a right protected by § 7106(a)(1) of the CSRA, 5 U.S.C. § 7106(a)(1), and was not therefore properly the subject of collective bargaining.

The FLRA found that the NTEU's petition for review was timely, rejected each of the NRC's substantive objections to the proposal's negotiability, and ordered that the NRC bargain over the NTEU's proposal. This petition and cross-petition for review followed.

## II

As a preliminary matter, it is necessary to address the NRC's reiterated assertion that the NTEU's petition for review before the FLRA was untimely. Section 7117(c) of the CSRA, 5 U.S.C. § 7117(c)(1) and (2) provides:

(c)(1) Except in any case to which subsection (b) of this section applies, if an agency involved in collective bargaining with an exclusive representative alleges that the duty to bargain in good faith does not extend to any matter, the exclusive representative may appeal the allegation to the Authority in accordance with the provisions of this subsection.

(2) The exclusive representative may, on or before the 15th day after the date on which the agency first makes the allegation referred to in paragraph (1) of this subsection, institute an appeal under this subsection by—

(A) filing a petition with the Authority; and

(B) furnishing a copy of the petition to the head of the agency.

Pursuant to its rulemaking power under § 7134 of the CSRA, the FLRA promulgated the following regulation, implementing the § 7117(c) time limits:

The time limit for filing a petition for review is fifteen (15) days after the date the agency's allegation that the duty to bargain in good faith does not extend to the matter proposed to be bargained is served on the exclusive representative. The exclusive representative shall request such allegation in writing and the agency shall make the allegation in writing and serve a copy on the exclusive representative: *Provided, however,* That review of a negotiability issue may be requested by an exclusive representative under this subpart without a prior written allegation by the agency if the agency has not served such allegation upon the exclusive representative within ten (10) days after the date of the receipt by any agency bargaining representative at the negotiations of a written request for such allegation.

5 C.F.R. § 2424.3 (1980). The FLRA has interpreted both § 7117(c) and § 2424.3 as providing that only an allegation of nonnegotiability tendered in response to a written request for such allegation starts the clock running on the fifteen day period for filing a petition for review with the FLRA. The NRC argues that this interpretation directly conflicts with § 7117(c) and should therefore be overturned. We disagree.

### A

It is by now well established that the FLRA is "entitled to considerable deference when it exercises its 'special function of applying the general provisions of the [Civil Service Reform] Act to the complexities' of federal labor relations." *Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (*BATF*) (quoting *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). Equally clear is the principle that "while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act ... they must not 'rubber stamp ... administrative decisions that

they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" 464 U.S. at 97, 104 S.Ct. at 444 (citations omitted). Nevertheless, this court must sustain the FLRA's order unless it is "arbitrary, capricious, an abuse of discretion, or otherwise unlawful." *American Fed'n of Gov't Employees, AFL–CIO, Local 2303 v. FLRA*, 815 F.2d 718, 719 (D.C.Cir.1987); *see* 5 U.S.C. § 706.

### B

■ Guided by the foregoing principles we find the FLRA's interpretation of § 7117(c) to be eminently reasonable. Section 7117(c) merely indicates that an agency may "allege" that a given matter is not the proper subject of collective bargaining and that within fifteen days after the "allegation" is made, an appeal may be instituted. The FLRA's implementing regulation, § 2424.3, and case interpretation of the statute, *see American Fed'n of Gov't Employees, AFL–CIO, Local 3385 and Fed. Home Loan Bank Bd., Dist. 7*, 7 F.L.R.A. 398 (1981), and the regulation merely flesh out the definition of "allegation" in a manner consistent with the statutory purpose. If the NRC's interpretation of "allegation" were to be accepted, mere statements regarding negotiability made during collective bargaining might force a union to institute review proceedings in order to preserve its right to review. The FLRA persuasively argues that this would be inconsistent with the statute's policy of facilitating collective bargaining. An exclusive representative would repeatedly be forced to institute review proceedings prior to determining whether a given proposal was worth fighting for as written or could be amended to meet both the union's and the agency's needs. The FLRA has permissibly construed § 7117(c) as providing that the triggering of the formal review process is best left in the hands of the union if the collective bargaining process is not to be broken down in a "fruitless cycle of agency objection and appeal." *Local 2303*, 815 F.2d at 722. We therefore decline to overturn the FLRA's interpretation of § 7117(c). *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (*Chevron*).

### III

Turning now to the merits of the NRC's petition for review, we address in order, the NRC's contentions that the NTEU's proposal is nonnegotiable as "inconsistent with federal law"; as excluded from the "conditions of employment" over which an agency is required to negotiate; and as an infringement on the NRC's right to determine its budget.

### A

■ Section 7102 of the CSRA gives federal employees the right to unionize and engage in collective bargaining with respect to "conditions of employment." 5 U.S.C. § 7102. Both federal agencies and labor organizations are required, under the CSRA, to bargain in good faith over the "conditions of employment" unless the statute otherwise exempts them from the obligation. *See* 5 U.S.C. §§ 7102, 7103(a)(14), 7114, 7116(a)(5) and (b)(5), 7117. One such exemption is contained in § 7117 of the CSRA which the parties agree prohibits bargaining over union proposals where to do so would be "inconsistent with federal law." [2]

---

2. Section 7117, in relevant part, provides:

    (a)(1) Subject to paragraph (2) of this subsection, the duty to bargain in good faith shall, to the extent not inconsistent with any Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any rule or regulation only if the rule or regulation is not a Government-wide rule or regulation.

    (2) The duty to bargain in good faith shall, to the extent not inconsistent with Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any agency rule or regulation referred to in paragraph (3) of this subsection only if the Authority has determined under subsection (b) of this section that no compelling need (as determined under regulations prescribed by the Authority) exists for the rule or regulation.

5 U.S.C. § 7117(a)(1) and (2).

The NRC argues that bargaining over the NTEU's proposal would be inconsistent with § 161(d) of the AEA, 42 U.S.C. § 2201(d), which in relevant part provides:

In the performance of its functions the Commission is authorized to—

d. appoint and fix the compensation of such officers and employees as may be necessary to carry out the functions of the Commission. Such officers and employees shall be appointed in accordance with the civil-service laws and their compensation fixed in accordance with ... [the Classification Act of 1949, as amended] except that, to the extent the Commission deems such action necessary to the discharge of its responsibilities, personnel may be employed and their compensation fixed without regard to such laws....[3]

The NRC admits that in 1975, upon its creation as a successor to the Atomic Energy Commission (AEC), it informed the Civil Service Commission of its election, pursuant to § 161(d), to continue the AEC's practice of exempting all positions within the agency from the requirements of the civil service laws and the Classification Act. However, the NRC argues that "by generally exempting its positions from the Classification Act of 1949, as amended, the [NRC] did not make the finding required by section 161(d) to enable it to deviate from the general civil service pay schedules." In other words, the NRC interprets § 161(d) as providing that "no discretion to depart from General Schedule pay rates is allowed until the Commission makes a finding that the departure is necessary to the discharge of its responsibilities and then such departure can only be to the extent

necessary to discharge its responsibilities." Considering its discretion over its employees' salaries to be so limited by Congressional directive, the NRC argues that the duty to bargain over the NTEU's salary proposal would be inconsistent with § 161(d).

The FLRA rejected the NRC's interpretation of § 161(d), and found instead that the language in § 161(d) relied upon by the NRC in finding its discretion congressionally circumscribed actually places no specific limit on the NRC's discretion to bargain over the NTEU's proposal. The FLRA then held that the unlimited discretion over the NRC employee's wages and salaries vested in the NRC as a result of its exemption election carries with it the duty to bargain in good faith over the NTEU's salary proposal. In short, the FLRA interprets § 161(d) as only placing limits on the NRC's discretion to exempt its positions from the civil service laws and Classification Act. Once the election is made, as here it concededly has been, the FLRA considers the NRC to be left with unbridled discretion over its employees' wages and salaries.[4]

Although, in resolving this conflict over the proper interpretation of § 161(d), we are mindful that considerable deference is due the construction which the NRC has placed on its enabling act, the Atomic Energy Act, *see* 42 U.S.C. § 2201, we find the NRC's interpretation to be an unreasonable construction of § 161(d) and flatly contrary to that section's plain language. The FLRA's interpretation on the other hand, while not entitled to equal deference, *compare Shanty Town Assoc. Ltd. v. EPA*, 843 F.2d 782, 790 n. 12 (4th Cir.1988) (holding

3. The Classification Act of 1949 is now referenced in the statute as "chapter 51 and subchapter III of chapter 53 of Title 5." Section 161(d) further provides:

*Provided, however,* That no officer or employee (except such officers and employees whose compensation is fixed by law, and scientific and technical personnel up to a limit of the highest rate of grade 18 of the General Schedule) whose position would be subject to [the Classification Act of 1949, as amended], if such [Act] were applicable to such position, shall be paid a salary at a rate in excess of the

rate payable under such [Act] for positions of equivalent difficulty or responsibility....
42 U.S.C. § 2201(d). The FLRA found and the parties agree that the legal limits imposed on NRC employees' salaries in this portion of § 161(d) are not relevant to the present appeal because the proposal is to be construed as limited consistent with the statutory constraints.

4. Again, the parties agree that the NTEU's salary proposal is to be construed consistently with the legal limits § 161(d) places on NRC employees' salaries. These legal limits are not, therefore, viewed as limits on the NRC's discretion.

that court is not required to defer to agency's interpretation of enabling acts other than its own) *with United States Dept. of Health & Human Services v. FLRA*, 833 F.2d 1129, 1135 (4th Cir.1987) (holding that FLRA interpretations of statutes other than CSRA are entitled to deference where "interpretation bears directly on the 'complexities' of federal labor relations"), is in accord with the plain language of § 161(d). Section 161(d) clearly gives the NRC the authority to exempt its positions from the civil service laws and the Classification Act "to the extent necessary to the discharge of its responsibilities." This clause cannot be read to limit the NRC's discretion over its employees' pay once the decision to exempt has been effectuated. The NRC offers no legislative history, and we know of none, to the contrary. As the final arbiter of issues of statutory construction, *FTC v. Colgate–Palmolive Co.*, 380 U.S. 374, 385, 85 S.Ct. 1035, 1043, 13 L.Ed.2d 904 (1965), we cannot give effect to an agency's interpretation of a statute that is "manifestly contrary" to that statute's plain language. *See Chevron*, 467 U.S. at 843–45, 104 S.Ct. at 2781–83.

In urging this court to find the NTEU's proposal inconsistent with § 161(d), the NRC relies heavily on the Third Circuit's recent decision in *Department of the Navy, Military Sealift Command v. FLRA*, 836 F.2d 1409 (1988) *(Sealift)*. There, the court held that proposals relating to the pay of civilian mariners were nonnegotiable because the mariners' positions were governed by the Prevailing Rate Act, 5 U.S.C. § 5348(a) (1982), which, in relevant part, provides that their pay "shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry." The court reasoned that bargaining over pay related proposals would be inconsistent with the congressional directive that the Navy assess and resolve competing public interest concerns prior to adjusting the mariners' pay. 836 F.2d at 1415–17. The

FLRA correctly contends that the Third Circuit's resolution of the statutory conflict in *Sealift* has no bearing on the present appeal. Not only are the NRC's employees not governed by the Prevailing Rate Act, but the language of § 161(d), as we have already held, places no limit on the NRC's bargaining discretion similar to that before the court in *Sealift*.[5] We therefore uphold the FLRA's finding that the NRC is not exempted from its duty to bargain in good faith over the NTEU's proposals by virtue of any inconsistency of this duty with § 161(d) of the Atomic Energy Act.

**B**

■ Again relying on *Sealift*, the NRC offers an alternative ground for finding the FLRA's bargaining order unenforceable as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982) (stating standard of review of FLRA order). The *Sealift* court, having already sufficiently concluded that bargaining over the relevant pay related proposal was inconsistent with § 5348(a) of the Prevailing Rate Act, and therefore nonnegotiable under § 7117 of the CSRA, went on to hold that unless a federal statute specifically provides to the contrary, the wages and salaries of federal employees are nonnegotiable. *See* 836 F.2d at 1419. With respect, we disagree.

Again, § 7102 of the CSRA obligates the NRC to bargain with the NTEU with respect to "conditions of employment," 5 U.S.C. § 7102, that are not exempted from the bargaining process under § 7117. Congress defined "conditions of employment" as:

(14) ... personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions, except that such term does not include policies, practices, and matters—

**5.** The D.C. Circuit's recent decision, adopting the Third Circuit's reasoning in *Sealift*, is similarly distinguishable. *See Department of the*

*Treasury, Bureau of Engraving and Printing v. FLRA*, 838 F.2d 1341, 1342–43 (D.C.Cir.1988).

(A) relating to political activities prohibited under subchapter III of chapter 73 of this title;

(B) relating to the classification of any position; or

(C) to the extent such matters are specifically provided for by Federal statute.

5 U.S.C. § 7103(a)(14). While recognizing that the wages and fringe benefits of most federal employees are "specifically provided for by Federal Statute," the FLRA has held that:

[T]he definition of the scope of bargaining which is embodied in the [CSRA] is perfectly clear. Under that definition, and consistent with practice under the Executive Order, substantive proposals regarding pay and fringe benefits which are not specifically provided for by Federal Statute, and any other conditions of employment are negotiable to the extent they are not inconsistent with applicable laws, rules and regulations if the matters proposed are within an agency's discretion.... Ambiguous legislative history does not compel a different conclusion.[6]

*American Fed'n of Gov't Employees, AFL–CIO, Local 1897 and Dept. of the Air Force, Eglin Air Force Base, Florida,* 24 F.L.R.A. 377, 383 (1986) (citations omitted) (*Eglin*). The FLRA applied its holding in *Eglin* to the NRC's and NTEU's dispute and found sufficient discretion in the NRC over its employees' salaries to mandate bargaining.

We consider the FLRA's interpretation of the CSRA and its legislative history to be a wholly "reasonable accommodation of conflicting policies that were committed to its care by the [CSRA]." *Shanty Town Assoc. Ltd. v. EPA,* 843 F.2d 782, 790 (4th Cir.1988). "[W]e are not at liberty to reject it merely because we might have reached a different conclusion if confronted with the issue in the first instance." *Id.* (citing *Chevron,* 467 U.S. at 843–44 & n. 11, 104 S.Ct. at 2781–82 & n. 11). This court has consistently recognized the special defer-

ence due the FLRA's exercise of its " 'special function of applying the general provisions of the [CSRA] to the complexities' of federal labor relations." *United States Dept. of Health and Human Services v. FLRA,* 833 F.2d 1129, 1135 (4th Cir.1987) (quoting *BATF,* 464 U.S. at 97, 104 S.Ct. at 444).

Faced with this same issue of whether federal employee pay related proposals are negotiable under the CSRA, a panel of this court recently unanimously held that a federal agency has "a general duty under 5 U.S.C. § 7117(a) to bargain in good faith over the wages of its employees" provided that the employees' pay is not specifically provided for by statute and the proposal is not otherwise exempt from negotiation under § 7117. *United States Dept. of Defense Dependent Schools, Fort Bragg, North Carolina v. FLRA,* No. 87–3061, slip op. at 4 (4th Cir. Feb. 3, 1988) (initially published at 838 F.2d 129) (Murnaghan, J., dissenting on other grounds). The panel opinion, during the pendency of the present appeal was, however, vacated as moot, *see* 838 F.2d 129, 130–38 (4th Cir.1988), and we must, therefore, address this issue anew. Although the panel opinion in *Fort Bragg* is not binding on us, we find the reasoning expressed therein persuasive. *See Fort Bragg,* slip op. at 13–15 (Murnaghan, J., dissenting on other grounds).

As the FLRA held in the present case, and as was noted in *Fort Bragg, id.,* the argument that Congress did not intend federal employee wages to be negotiable as conditions of employment is based on a few isolated and ambiguous statements in the CSRA's legislative history. In particular, the NRC points out that Congressman Udall, one of the bill's chief sponsors, stated that "regulations about wages and hours ... will continue to be established by law through congressional action." 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978). Congressman Clay, another of the CSRA's

---

**6.** Prior to enactment of CSRA, federal employment matters were governed by Executive Orders. *See BATF v. FLRA,* 464 U.S. 89, 91, 104 S.Ct. 439, 441, 78 L.Ed.2d 195 (1983). Under this regime, the FLRA's predecessor, the Federal

Labor Relations Council found pay matters to be negotiable unless provided for by law or in conflict with an agency rule or regulation. *See Eglin,* 24 F.L.R.A. at 381.

sponsors, stated that "there is nothing in this bill which allows Federal employees the right to ... negotiate over pay and money-related fringe benefits." 124 Cong. Rec. H8466 (daily ed. Aug. 11, 1978). In a similar vein, the House Report on the CSRA stated that "Federal pay will continue to be set in accordance with the pay provisions of title 5, and fringe benefits, including retirement, insurance, and leave, will continue to be set by Congress." H.R. Rep. No. 95–1403, 95th Cong., 2d Sess. 12 (1978). Congressman Clay also stated, in support of the Udall version of Title VII of the CSRA ultimately enacted into law:

> Section 7103(a)(14)(D), removing from subjects of bargaining those matters specifically provided for by Federal statute, was adopted by the committee and retained in the Udall substitute with the clear understanding that only matters "specifically" provided for by statute would be excluded under this subsection. Thus, where a statute merely vests authority over a particular subject with an agency official with the official given discretion in exercising that authority, the particular subject is not excluded by this subsection from the duty to bargain over conditions of employment.

124 Cong.Rec. H9638 (daily ed. Sept. 13, 1978).

The legislative history of Title VII of the CSRA is clearly ambiguous, as the FLRA has concluded, on the matter of negotiability of federal employee pay-related proposals. Faced with the ambiguous remarks of the CSRA's sponsors, which on the one hand suggest that pay is generally nonnegotiable but on the other suggest that pay is negotiable if not specifically provided for by law, the FLRA reasonably concluded that the plain language of the CSRA, in light of the Act's policy of encouraging

collective bargaining, indicated a Congressional intent that wages, as "matters ... affecting working conditions," 5 U.S.C. § 7103(a)(14), be generally negotiable if not otherwise exempted from negotiation under sections 7103 and 7117.[7] "An ambiguous legislative history ... will not suffice to displace the FLRA's reasonable construction of the Act's language." *American Fed'n of Gov't Employees, Locals 225, 1504, and 3723, AFL–CIO v. FLRA,* 712 F.2d 640, 649 (D.C.Cir.1983). We therefore affirm the FLRA's conclusion that the NRC, vested as it is under § 161(d) with discretion over its employees' wages, has a general duty to bargain over pay-related proposals.

### C

The NRC finally argues that the NTEU's proposal interferes with its management right to determine its own budget and is therefore properly considered nonnegotiable under 5 U.S.C. § 7106(a)(1). Section 7106 in relevant part provides:

> (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—
>
> (1) to determine the ... budget ... of the agency
>
> . . . .
>
> (b) Nothing in this section shall preclude any agency and any labor organization from negotiating—
>
> . . . .
>
> (2) procedures which management officials of the agency will observe in exercising any authority under this section. . . .

5 U.S.C. § 7106. The FLRA, in interpreting § 7106, has held that in order to establish nonnegotiability pursuant to § 7106,

---

**7.** The NRC argues that the use of the single phrase "conditions of employment" in the CSRA indicates that Congress intended to exclude wages from negotiable matter because in § 158(d) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(d) (1982), Congress specified that bargaining was required "with respect to wages, hours and other terms and conditions of employment." Because Congress had the NLRA in mind while drafting the CSRA,

the NRC argues, the deletion of "wages" from the defined bargaining duty is significant. Although the Third Circuit agrees with this interpretation of the omission, *see* 836 F.2d at 1416 n. 14, we find the import clearly to the contrary. The use of the connecting word "other" in the NLRA suggests that Congress considers wages, among other things, to be conditions of employment.

either an agency must demonstrate that a given proposal "attempt(s) to prescribe the particular programs or operations the agency would include in its budget or to prescribe the amount to be allocated in the budget for them," or, where a proposal does not so attempt, the agency must "make[ ] a substantial demonstration that an increase in costs is significant and unavoidable and is not offset by compensating benefits." *American Fed'n of Gov't Employees and Air Force Logistics Command, Wright–Patterson Air Force Base*, 2 F.L.R.A. 604, 607–08 (1980) (*Wright–Patterson* ).[8]

In the present case, the FLRA ruled that the NTEU's proposal did not attempt to prescribe a specific amount to be allocated on the NRC's budget. Rather, the FLRA reasoned, the proposal merely suggested a procedure and ultimately a percentage by which NTEU employee salaries might be adjusted to allow for cost of living increases. Because the NRC retained control of the amount of its budget to be allocated for the salaries, the proposal does not prescribe a specific amount which the NRC must allocate in its budget. In other words, as the FLRA has elsewhere stated,

the proposal "establishes a percentage of the total ... cost to be absorbed by the Agency. What that percentage means in terms of the amount to be budgeted depends on factors not covered by the proposal, but within the Agency's control." *Eglin*, 24 F.L.R.A. at 386.

█ While admitting that the NTEU's proposal does not prescribe a specific dollar amount to be allocated in its budget, the NRC argues that the proposal allows a third party, the Advisory Committee on Federal Pay, the authority to determine the salary component of the NRC's budget. This argument does not address the FLRA's conclusion that the proposal merely sets a procedure for adjusting salaries, an item already existing in the NRC's budget and over which the NRC has control. We consider the FLRA's application of § 7106 and the first aspect of the *Wright–Patterson* test to the NTEU's proposal to be a reasonable construction of the CSRA and therefore decline to upset the FLRA's finding in this regard.

█ The FLRA also analyzed the NTEU's proposal under the second aspect of the *Wright–Patterson* test and held that the NRC had not "made a substantial dem-

---

**8.** The full explanation of the FLRA's development of the *Wright–Patterson* test bears repeating as demonstrative of the reasonableness of the FLRA's interpretation of § 7106:

There is no question but that Congress intended that any proposal which would directly infringe on the exercise of management rights under section 7106 of the Statute would be barred from negotiation. Whether a proposal directly affects the agency's determination of its budget depends upon the definition of "budget" as used in the Statute. The Statute and legislative history do not contain such a definition. In the absence of a clearly stated legislative intent, it is appropriate to give the term its common or dictionary definition. As defined by the dictionary, "budget" means a statement of the financial position of a body for a definite period of time based on detailed estimates of planned or expected expenditures during the period and proposals for financing them. In this sense, the agency's authority to determine its budget extends to the determination of the programs and operations which will be included in the estimate of proposed expenditures and the determination of the amounts required to fund them. Under the Statute, therefore, an agency cannot be re-

quired to negotiate those particular budgetary determinations. That is, a union proposal attempting to prescribe the particular programs or operations the agency would include in its budget or to prescribe the amount to be allocated in the budget for them would infringe upon the agency's right to determine its budget under section 7106(a)(1) of the Statute.

Moreover, where a proposal which does not by its terms prescribe the particular programs or amounts to be included in an agency's budget, nevertheless is alleged to violate the agency's right to determine its budget because of increased cost, consideration must be given to all the factors involved. That is, rather than basing a determination as to the negotiability of the proposal on increased cost alone, that one factor must be weighed against such factors as the potential for improved employee performance, increased productivity, reduced turnover, fewer grievances, and the like. Only where an agency makes a substantial demonstration that an increase in costs is significant and unavoidable and is not offset by compensating benefits can an otherwise negotiable proposal be found to violate the agency's right to determine its budget under section 7106(a) of the Statute.

*Id.* (citations omitted).

onstration that implementation of the proposal will result in a significant, unavoidable increase in costs which is not outweighed by compensating benefits." The FLRA rejected the NRC's contention that the annual cost of living adjustment recommended by the Advisory Committee on Federal Pay,[9] if adopted,[10] would have a substantial unavoidable impact on the NRC's ability to determine its budget. The FLRA reasoned that increased cost is only one factor to be considered and that, standing alone, the cost increase that might flow from the NTEU's proposal did not interfere with the NRC's § 7106 budget determination right. Because the NRC failed to even address the issue of compensatory benefits, the FLRA found the NTEU's proposal to be the proper subject of collective bargaining.

We again find the FLRA's construction of § 7106 as applied to the union's proposal to be reasonable. The NRC asks that we construe § 7106 as barring a proposal's negotiability upon a mere showing by an agency of what amounts to less than a five percent increase relative to the agency's total budget.[11] Such a construction of this provision of the CSRA would likely render the vast majority of proposals nonnegotiable. Congress intended, however, that § 7106 "'be read to favor collective bargaining whenever there is doubt as to the negotiability of a subject or a proposal.'" *American Fed'n of Gov't Employees, Locals 225, 1504, and 3723, AFL–CIO v. FLRA,* 712 F.2d 640, 649 n. 36 (D.C.Cir. 1983) (quoting H.R.Rep. No. 95–1403, 95th Cong., 2d Sess. 44 (1978)). The FLRA, therefore, reasonably concluded that the NRC must show that any anticipated in-

crease in cost was not offset by benefits such as those outlined in *Wright–Patterson.*[12] The NRC having made no such showing, the FLRA properly found § 7106 to present no bar to the NTEU's proposal's negotiability.

## IV

In enacting Title VII of the Civil Service Reform Act, Congress expressed its finding that

"labor organizations and collective bargaining in the civil service are in the public interest," 5 U.S.C. § 7101(a) (1982 ed.), [and] significantly strengthened the position of public employee unions while carefully preserving the ability of federal managers to maintain "an effective and efficient government," § 7101(b).

*BATF,* 464 U.S. 89, 92, 104 S.Ct. 439, 441 (1983) (footnote omitted). The CSRA created the FLRA and directed that it "'provide leadership in establishing policies and guidance relating to matters' arising under the Act." *Id.* at 93, 104 S.Ct. at 442. We find that in applying the CSRA to the present negotiability dispute, the FLRA has properly carried out its function under the Act. Accordingly, we deny the petition for review, affirm the decision of the FLRA, and grant enforcement of the FLRA's bargaining order.

SO ORDERED.

---

9. The parties represent that this increase has averaged a rate of approximately 10% since 1982, and has been more on the order of 5% in more recent years.

10. Under the CSRA, the parties have a duty to negotiate over a bargainable proposal until an impasse is reached. Section 7119 provides for the resolution of such impasse, including ordering parties to agree to the specific proposal, *see Council of Prison Locals v. Brewer,* 735 F.2d 1497, 1499 (D.C.Cir.1984), by the Federal Service Impasses Panel. 5 U.S.C. § 7119.

11. Even were a twenty percent increase recommended in a given year, the worst scenario presented by the NRC in its petition for review, the NRC admits this would amount at most to approximately an eight percent increase in the agency's roughly four hundred million dollar budget.

12. *See supra* note 8. The NRC appears to argue that this requirement from *Wright–Patterson* is arbitrary and capricious. This issue was not raised before the Commission in the first instance and therefore will not be considered by this court. 5 U.S.C. § 7123(c).