**DEPARTMENT OF DEFENSE
DEPENDENTS SCHOOLS,
Petitioner,**

v.

**FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.**

No. 87–1733, et al.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 18, 1988.

Decided Dec. 20, 1988.

Rehearing En Banc Granted
Feb. 6, 1989.

Jacob M. Lewis, Attorney, Dept. of Justice with whom John R. Bolton, Asst. Atty. Gen., William Kanter, Attorney, Dept. of Justice were on the brief, for petitioner.

Jill A. Griffin, Attorney, Federal Labor Relations Authority with whom William E. Persina, Acting Solicitor, Federal Labor Relations Authority was on the brief, for respondent.

Richard J. Hirn with whom Ronald A. Austin was on the brief, for intervenor.

Before ROBINSON, STARR and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

These petitions for review raise issues concerning the negotiability of proposals with respect to the compensation of teachers employed overseas by the Department of Defense Dependents Schools. For the reasons that follow, we conclude, in conformity with a recent decision by our colleagues in the Third Circuit, that wages and other matters pertaining to compensation of federal employees fall outside the duty to bargain under the Federal Labor Relations Statute, 5 U.S.C. §§ 7101–35 (1982 & Supp. IV 1986) ("Statute").

## I

As its name suggests, the Department of Defense Dependents Schools (DODDS) administers an elaborate school system for minor dependents of U.S. military and civilian personnel stationed overseas. The Overseas Education Association (OEA) is the exclusive representative of DODDS teachers in three of the system's regions across the globe.

There are four consolidated cases before us. Each, however, presents a common issue of law which emerged from OEA's advancement at the bargaining table of ten proposals relating to teachers' compensation. For example, OEA proposed that DODDS pay its overseas teachers time and a half for time spent outside the regular day carrying on the duties of Student Activity Fund Councils. In like manner, another proposal called for DODDS to pay time and a half for time spent making up lost instructional time that exceeds 183 instructional days, along with double time for work at times such as weekends and holidays.

■ The details of the ten proposals need not detain us. The relevant point for our purposes is that DODDS responded by contesting the negotiability of all ten of the proposals.[1] The question thus went before the Federal Labor Relations Authority for resolution pursuant to section 7117(c) of the Statute. In four separate decisions handed down in September and October 1987, a divided FLRA concluded that each of the proposals was in fact negotiable. The Authority emphasized that, under this court's decision in *March v. United States*, 506 F.2d 1306 (D.C.Cir.1974), DODDS was at liberty to negotiate over wages to the extent that the proposals did not relate to "basic compensation" under the Overseas Teachers Pay and Personnel Practices Act, 20 U.S.C. §§ 901 *et seq.* (1982). In the cases at hand, the Authority determined that DODDS enjoyed discretion in fixing the terms of compensation; the matters were not, in short, dictated by law. Where those two features were present, namely agency discretion and non-establishment by law, the matters were deemed to fall within the agency's duty to bargain under the Statute. *See* 29 FLRA No. 61, at 106; Joint Appendix (J.A.) at 191.

FLRA Chairman Calhoun dissented in each of the cases. The Chairman relied on his previous dissenting position in *American Federation of Government Employees and Department of the Air Force, Eglin Air Force Base*, 24 FLRA 377 (1986), in which he argued that, while the wages and fringe benefits of most federal employees are established by law, the forty-odd federal pay systems which are not entirely fixed by statute are nonetheless outside the scope of the duty to bargain.

These petitions for review (one of which was filed in the Fourth Circuit and transferred to this court) followed, and the cases were consolidated. The Authority has cross-applied for enforcement.

## II

■ As the parties recognize, our review is governed by the familiar principles rear-

---

1. The Authority argues that 5 U.S.C. § 7123(c) bars review of the negotiability of Proposals 11 and 31 because DODDS did not object to those two proposals before the Authority on the specific grounds asserted here. We are not persuaded. Section 7123(c) states that "no objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances." In this case, the broad challenge made to the negotiability of these proposals was originally made by Chairman Calhoun in his dissent from the majority's determination. *See* 29 F.L.R.A. No. 61 (Oct. 2, 1987). Since § 7123(c) reflects "an intent that the FLRA shall pass upon issues arising under the Act, thereby bringing its expertise to bear on the resolution of those issues," *Equal Employment Opportunity Commission v. F.L.R.A.*, 476 U.S. 19, 23, 106 S.Ct. 1678, 1680, 90 L.Ed.2d 19 (1986), and the FLRA majority was certainly confronted with Chairman Calhoun's objections, we are sanguine in our conclusion that the strictures of § 7123(c) were satisfied. *See United States Dept. of Health and Human Services v. F.L.R.A.*, 844 F.2d 1087, 1095 n. 1 (4th Cir.1988). It would also be oddly asymmetrical (although by no means out of the question were the FLRA truly blindsided by a latter-day objection) to embrace the Authority's objection going to only two of ten issues raising precisely the same question of law.

ticulated in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and its progeny. Thus, in assessing whether wages are negotiable under the Statute, our first task is to attempt to determine Congressional intent using "traditional tools of statutory construction." *Id.* at 842–43 & n. 9, 104 S.Ct. at 2781–82 & n. 9. If, under this analysis, we conclude that Congress' intent is clear, then we need not reach the *Chevron* Step Two question of whether the agency's interpretation of the statute is a permissible one. *See id.* at 842–43, 104 S.Ct. at 2781–82.

## A

■ As always, our inquiry into legislative intent focuses primarily on the language of the statute. *See Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). The language Congress chose to employ is more than a mere launching pad for a wide-ranging interpretive enterprise by lawyers and judges. In a memorable dissent over a generation ago, Learned Hand reminded bench and bar that, although statutory interpretation represents a sensitive, judgmental undertaking, the words of the statute are "no doubt the most important single factor in ascertaining [the legislature's] intent." *Commissioner v. Ickelheimer*, 132 F.2d 660, 662 (2nd Cir.1943); *see also Georgetown University Hospital, et al. v. Otis R. Bowen, Sec'y of Health and Human Services*, 862 F.2d 323, 330 (1988) (Mikva, J., concurring) (plain meaning of the statute renders further investigations unnecessary). It is, in short, the statute that constitutes law. Here, the Federal Labor Relations Statute extends collective bargaining in the federal workplace only to "conditions of employment."

5 U.S.C. § 7102(2). "Conditions of employment," in turn, are defined as "personnel policies, practices, and matters ... affecting working conditions...." 5 U.S.C. § 7103(a)(14). Thus, the central question is whether Congress intended "wages and fringe benefits" to be included within this definition.

A straightforward, natural reading of the statutory language fails to yield the FLRA's interpretation, namely that "working conditions" should be read to include "wages." Far from it. The term "working conditions" ordinarily calls to mind the day-to-day circumstances under which an employee performs his or her job. *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 221–22, 85 S.Ct. 398, 408–09, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring) (although "[t]he phrase 'conditions of employment' is no doubt susceptible of diverse interpretations[,]" ... "[i]n common parlance, the conditions of a person's employment are most obviously the various physical dimensions of his working environment"). Thus, for example, this court has upheld the FLRA's conclusion that matters relating to job safety and office environment are "central" to an employee's working conditions. *See Library of Congress v. F.L.R.A.*, 699 F.2d 1280, 1286 (D.C.Cir.1983). However, it is entirely unclear how an employee's compensation can be seen as "affecting" such working conditions. If there is any relationship between wages and working conditions, it is that the conditions of employment sometimes affect the wages received—not vice versa.[2]

However, we need not end the interpretive inquiry with a focus on the more "natural" reading of the operative language. Equally strong indications of Congressional intent can be discerned by reference to

2. In addition, wages cannot reasonably be construed as a "personnel policy," and there is significant room for doubt whether they can reasonably be viewed as constituting a "practice" or "matter." However, even if we were to conclude that wages could be considered a "matter" within the ambit of § 7103(a)(14), we are still left with the puzzling question of why Congress would have included wages—probably the single most important bargaining issue in the employee-employer relationship—in the Statute in such an oblique fashion. Obviously, nothing stood in the way of Congress' being express in this particular. In this regard, we note indications in the legislative history that efforts were made to include specific provisions for the negotiability of wages. These efforts, however, were unavailing. *See infra* page 992.

other collective bargaining regimes in which Congress has recognized that "wages" and "working conditions" are by no means the same (or, more precisely, that the former is not a subset of the latter). Thus, for example, the National Labor Relations Act authorizes collective bargaining over "wages, hours, and other terms and conditions of employment." 29 U.S.C. 158(d) (1982); *see also Dep't of Navy, Military Sealift Com. v. F.L.R.A.*, 836 F.2d 1409, 1416 n. 14 (3rd Cir.1988) (finding Congress' use of only "conditions of employment" in the Statute to imply "a narrower range of bargainable matters under the Labor–Management Statute than under the NLRA").[3] Congress recognized the same distinction in the Overseas Pay Act, when it authorized the Secretary of Defense to promulgate regulations concerning "the payment of compensation" to overseas teachers in one section of the statute, while granting the same authority as to "the conditions of employment" in another. *Compare* 20 U.S.C. § 902(a)(4) (1982) *with* 20 U.S.C. § 902(a)(6) (1982). Similar treatment of "wages" and "working conditions" appears in other pay systems[4] and other types of statutes.[5] Indeed, the FLRA has pointed us to no collective bargaining scheme, or any other type of statute, in which "working conditions" has been construed to include wages.[6]

Congress had occasion to reaffirm this familiar, common-sense distinction in the 1978 Civil Service Reform Act (CSRA), which of course contains the Federal Labor Relations Statute itself. In continuing the collective bargaining rights of "prevailing rate" employees who had previously engaged in such bargaining, Congress in section 704 of the CSRA distinguishes between bargaining over "terms and conditions of employment and other employment benefits" and "pay and pay practices." The Prevailing Rate Act, Pub.L. No. 95–454, § 704(a), (b), 92 Stat. 1111, 1218 (1978) (reprinted at 5 U.S.C. § 5343 note (1982)). The legislative history of section 704 provides further support for this distinction. *See* H.R.Cong.Rep. 95–1717, 95th Cong., 2d Sess. 159 (1978), U.S.Code Cong. & Admin. News 1978, pp. 2723, 2893 (explaining that section 704 was enacted to provide "specific statutory authority" for negotiation of "wages, terms and conditions of employment and other employment benefits....").

**3.** The Fourth Circuit, in *Nuclear Regulatory Commission v. F.L.R.A.*, 859 F.2d 302 (1988), takes issue with this analogy, arguing that "[t]he use of the word 'other' in the NLRA suggests that Congress considers wages, among other things, to be conditions of employment." *Id.*, at 310 n. 7. The Eleventh Circuit makes the same argument in *Ft. Stewart Schools v. F.L.R.A.*, 860 F.2d 396, 400–01 (1988). We are, with all respect, not persuaded. The NLRA uses the language "other *terms and* conditions of employment." In light of other evidence of Congressional intent discussed in the text, it is more natural to conclude that wages were included as a *term* of employment, not a "condition."

**4.** *See, e.g.,* Title XI of Education Amendments of 1978, 25 U.S.C. § 2011(b)(7), (8) (1982) (distinguishing between "the payment of compensation to educators" and "the conditions of employment of educators"); The Postal Reorganization Act, Pub.L. No. 91–375, § 10(a), 84 Stat. 719, 784 (1970) (reprinted at 39 U.S.C. § 1201 note (Labor Agreements) (1982)) (authorizing the negotiation of an agreement covering "wages, hours, and working conditions").

**5.** *See, e.g.,* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1982) (prohibiting discrimination "with respect to compensation, terms, conditions, or privileges of employment"); American Indian, Alaska Native, and Native Hawaiian Culture and Art Development Act, 20 U.S.C. § 4416(b)(3)(A)(ii), (iii), (iv) (Supp. IV 1986) (distinguishing between "basic compensation," "entitlement to compensation," and "conditions of employment" for employees of Culture and Art Institute).

**6.** Our own research has revealed language in two federal statutes indicating that Congress may arguably have considered wages to be a "condition of employment." *See* The Senior Executive Service Act, 5 U.S.C. § 3131(1) (1982) (providing for "a compensation system, including salaries, benefits, and incentives, and for other conditions of employment"); 18 U.S.C. § 4082(c)(2)(iii) (1982) (providing for "the rates of pay and other conditions of employment" of federal prisoners on work-release). However, neither of these statutes defines wages as a "condition of employment" (much less as a "working condition"). In any event, the Authority has placed no reliance on them. Finally, even if these two measures were deemed to becloud Congress' intent in the Statute, any uncertainty is dissipated by the powerful indicia of legislative intent contained in the statute's history, a matter to which we presently turn in the text.

It is a commonplace that courts will ordinarily assume that identical words employed in different parts of the same act are intended to have the same meaning. *See Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986). We therefore have no reason to believe that Congress intended "conditions of employment" to encompass wages in the Federal Labor Relations Statute when it did not do so in section 704 of the very same Act (the CSRA).[7]

### B

In contrast to the FLRA's view, powerful evidence of Congressional intent to *exclude* wages from the duty to bargain abounds in the legislative history. The Senate Report, for example, states with admirable clarity that "[t]he bill permits unions to bargain collectively on personnel policies and practices and other matters affecting working conditions within the authority of agency managers.... *It excludes bargaining on economic matters....*" S.Rep. No. 95–969, 95th Cong., 2d Sess. 12–13 (1978), U.S. Code Cong. & Admin.News 1978, pp. 2734, 2735 (emphasis added). The House Report is equally emphatic, stating that the statute "does not permit ... bargaining on wages or fringe benefits." H.R.Rep. 95–1403, 95th Cong., 2d Sess. 12 (1978). In a supplemental statement appended to the House Report, the committee stated:

"Those of our colleagues who are concerned that this bill will significantly expand the collective bargaining rights of Federal employees need not worry. It does not. Enactment of the committee approved labor-management title will continue to deny to Federal employees most of the collective bargaining rights which their counterparts in the private sector have enjoyed for over 40 years. Among the collective bargaining rights not included in the bill are: ... (2) The right to bargain collectively over pay and money-related fringe benefits such as re-

tirement benefits and life and health insurance...."

Supplemental Views to H.R. 11280, *id.*, at 377.

As if more were needed, debate on the House floor likewise evidences an intent to exclude negotiations over wages. Congressman Udall, author of the compromise bill that ultimately became the Statute, explained with pristine simplicity: "We do not permit bargaining over pay and fringe benefits." 124 Cong.Rec. 25,716 (1978). Congressman Clay, a member of the House Committee on Post Office and Civil Service, assured his colleagues that under the Statute "employees still ... cannot bargain over pay." 124 Cong.Rec. E4293 (daily ed. Aug. 3, 1978). In like manner, Senator Sasser stated that "Federal employees may not bargain over pay or fringe benefits." 124 Cong.Rec. 27,549 (1978).

The legislative history sheds even further light in that Congress chose *not* to adopt certain proposed amendments to the statute. Congressman Ford, for example, proposed a bill which would have provided for collective bargaining over "pay and other major money-related fringe benefits." *See id.* at 25,721 (discussing H.R. 9094). In addition, during the House markup, Congressman Heftel proposed that the duty to bargain extend explicitly to "pay practices" and "overtime practices" so far as "consonant with law and regulation." H. Comm. on Post Office & Civil Service, Subcomm. on Postal Personnel & Modernization, 96th Cong., 1st Sess., *Legislative History of the Federal Service Labor–Management Relations Statute*, 1087–88 (1979) (proposing new § 7115(b)). Neither proposal was adopted, a fact of no little interpretive significance. *Cf. INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1219, 94 L.Ed. 2d 434 (1987) (noting the "compelling" principle of statutory construction "that Congress does not intend *sub silentio* to enact

---

**7.** *Cf. Ft. Stewart Schools v. F.L.R.A.*, 860 F.2d 396, 400–01 (11th Cir.1988) (addressing the argument that § 704 of the Prevailing Rate Act would be rendered superfluous by the conclusion that wages are negotiable under the Stat-

ute, but not examining the interpretive significance of the Act's language for determining Congressional intent underlying the term "conditions of employment" throughout the CSRA).

statutory language that it has earlier discarded in favor of other language").

Undaunted, the FLRA stoutly contends that this rather formidable array of legislative history does not indicate clear Congressional intent on the issue of agency-determined, as opposed to statutorily determined, pay schemes. Rather, the Authority claims, Congress intended to preclude bargaining on compensation matters only to the extent that these matters were specifically provided for by statute.

We are unpersuaded. On close analysis, it will readily be seen that the Authority has simply provided evidence of Congressional recognition that matters, including pay, which are specifically provided for by statute are nonnegotiable.[8] In sum, presented with no affirmative indication that pay is negotiable if not otherwise specifically provided for by law, we are convinced that Congress' intent was to exclude the pay of federal employees from the list of bargainable subject matters under the Statute.[9]

### C

Finally, we note that much of the foregoing analysis was very recently set forth by our colleagues on the Third Circuit in the case of *Dep't of Navy, Military Sealift Com. v. F.L.R.A.*, 836 F.2d 1409 (1988).

There, the Third Circuit concluded that bargaining over pay was inconsistent with § 706(2)(A) of the Prevailing Rate Act, and therefore outside the Military Sealift Command's duty to bargain under the Statute. More pertinently, the court also held (quite apart from the Prevailing Rate Act) that the Federal Labor Relations Statute did not obligate the Military Sealift Command to negotiate over the wages of civilian mariners. To reach this latter conclusion, the court exhaustively analyzed the legislative history of the Statute, found it "replete with indications" that wages were nonnegotiable, *id.* at 1417, and held that "Congress did not intend to subject the pay of federal employees to collective bargaining under the Labor–Management Statute." *Id.* at 1419.

Even more recently, in *Dep't of Treasury v. F.L.R.A.*, 838 F.2d 1341 (D.C.Cir. 1988), a panel of this court was presented with the issue whether the Department of Treasury was obligated to bargain over wages with an electricians' union. Finding the case "not rationally distinguishable" from *Military Sealift*, the panel faithfully applied the Third Circuit's analysis and held that the agency had no duty to bargain. *Id.* at 1342. In addition, the panel intimated that it was adopting the reasoning of *Military Sealift* with regard to the

8. *See, e.g.,* 124 Cong.Rec. H9638 (daily ed. Sept. 13, 1978) (remarks of Congressman Clay) ("Thus, where a statute merely vests authority over a particular subject with an agency official given discretion in exercising that authority, the particular subject is not excluded by [present-subsection 7103(a)(14)(C) ] from the duty to bargain over conditions of employment."); H.R. Rep. No. 95–1403, 95th Cong., 2d Sess. 44 (1978) ("Rates of overtime pay are not bargainable, because they are specifically provided for by statute."); 124 Cong.Rec. 25,777 (1978) (remarks of Congressman Ford) ("[N]o matters that are governed by statute (such as pay, money-related fringe benefits and so forth) could be altered by a negotiated agreement."). Of course, § 7103(a)(14)(C) codifies these statements, excluding matters from the definition of "conditions of employment"—and, hence, rendering them nonnegotiable—"to the extent such matters are specifically provided for by Federal statute."

9. We can quickly dispose of the FLRA's remarkable suggestion that, to the extent the legislative history sweeps broadly in indicating that mat-

ters pertaining to pay are nonnegotiable, Congress was simply laboring in ignorance of the forty-odd federal pay schemes in which the rates of pay are determined not by law, but by the agency in question. Our legal culture simply does not admit of the extravagant notion that Congress toils blissfully in ignorance of its own statutes. *See Cannon v. University of Chicago,* 441 U.S. 677, 696–98, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979).

Equally unconvincing is the Authority's suggestion that Congress—in adopting the Statute—broadly ratified the decisions of the Federal Labor Relations Council rendered under the prior, pre-1978 regime, to the effect that pay is indeed negotiable if not determined by statute. Although we will normally presume that Congress intends to continue the interpretation accorded to a prior statute when it substantially re-enacts that law, such a presumption is plainly inapposite in a situation, such as the case at hand, where Congress has clearly expressed its intent to the contrary.

language and history of the Statute.[10] The extent of *Dep't of Treasury's* "adoption" is now the subject of lively debate among the parties.[11] However, we need not tarry over whether *Dep't of Treasury* is actually dispositive as the law of the circuit, for we conclude—for reasons already stated—that the language and history of the Statute indicate that wages do not fall within the duty to bargain.[12]

For these reasons, we grant DODDS' petitions for review. Accordingly, the FLRA's decision will be set aside, and the FLRA's cross-petitions for enforcement denied.

JUDGMENT ACCORDINGLY.

---

10. The court stated:

The Third Circuit, after examining incisively the language and legislative history of the Prevailing Rate Act and the FSLMRS, concluded that the FLRA erred in requiring the Navy to bargain over the wages of its civilian mariners.

The reasoning of the Third Circuit with regard to the Navy, civilian mariners, and 5 U.S.C. § 5348 [of the Prevailing Rate Act] fully applies to DOT, electricians in the Bureau of Engraving and Printing, and 5 U.S.C. § 5349 [of the Prevailing Rate Act]. We find the Third Circuit's analysis of the statutory language and history entirely persuasive and we adopt that court's reasoning as our own. *Dep't of Treasury,* 838 F.2d at 1343. The first of the two paragraphs certainly suggests approbation of the Third Circuit's analysis of the Statute and its history. *Cf. infra* n. 11.

11. The FLRA contends that our court merely embraced the Third Circuit's holding that the Prevailing Rate Act is inconsistent with the duty to bargain under the Statute. Since the case before us is not a Prevailing Rate Act case, the Authority argues, *Dep't of Treasury* is not controlling. *Cf. supra* n. 10.

12. In arriving at this conclusion, we are fully aware of contrary decisions in three of our sister circuits. *See Ft. Stewart Schools v. F.L.R.A.,* 860 F.2d 396 (11th Cir.1988); *West Point Elementary School Teachers Association v. F.L.*

*R.A.,* 855 F.2d 936 (2d Cir.1988); *Nuclear Reg. Comm'n v. F.L.R.A.,* 859 F.2d 302 (4th Cir.1988); *see also supra* nn. 3, 7. However, we choose respectfully to disagree with the opinions expressed by these courts, for two reasons. First, all three courts accorded significant deference to the FLRA's interpretation of the language and history of the Statute. *See Ft. Stewart Schools,* at 400; *West Point Elementary,* 855 F.2d at 942; *NRC,* at 309. Such deference is, of course, appropriate under a *Chevron* Step Two analysis, where the issue would be whether the FLRA's interpretation of its own statute is reasonable; but deference is not the correct analytic mode under *Chevron* Step One, where our task is to assess independently the evidence of Congressional intent. *See supra,* at 990. Second, in agreeing with the FLRA that the legislative history of the Statute is "clearly ambiguous," the *NRC* court was in part persuaded by evidence suggesting "on the one hand ... that pay is generally nonnegotiable but on the other ... that pay is negotiable if not specifically provided for by law...." *NRC,* at 310. As discussed above, we have been provided with no affirmative evidence—in the papers presented by the parties, in any of our sister circuits' opinions, nor from our own independent research—indicating Congressional intent that *"pay* is negotiable if not specifically provided for by law." In the absence of such evidence, the legislative history of the Statute is unambiguous in supporting the conclusion that wages are not a negotiable subject matter.