**TRT TELECOMMUNICATIONS
CORPORATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,**

**Turner Broadcasting System, Inc.,
Reuters Information Services
Inc., Intervenors.**

**SATELLITE TRANSMISSION AND
RECEPTION SPECIALISTS,
Petitioner,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,**

**Turner Broadcasting System, Inc.,
Reuters Information Services
Inc., Intervenors.**

Nos. 88–1357, 88–1358.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 18, 1989.

Decided May 23, 1989.

Robert E. Conn, Washington, D.C., for petitioners.

Jane E. Mago, Atty., F.C.C., with whom Diane S. Killory, General Counsel, Daniel M. Armstrong, Associate General Counsel, John E. Ingle, and Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., were on the brief, for respondent.

Catherine G. O'Sullivan, and Marion L. Jetton, Attys., Dept. of Justice, Washington, D.C., also entered appearances, for respondent in No. 88–1357 and No. 88–1358.

Andrea Limmer, Washington, D.C., also entered an appearance, for respondent in No. 88–1358.

Kenneth E. Hardman, Washington, D.C., was on the brief, for intervenor, Reuters Information Services, Inc., in No. 88–1357 and No. 88–1358.

Phillip L. Spector and Jeffrey H. Olson, Washington, D.C., entered appearances, for Turner Broadcasting System, in No. 88–1357 and No. 88–1358.

Before RUTH B. GINSBURG, STARR, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Common carriers TRT Telecommunications Corporation and Satellite Transmission and Reception Specialists (collectively "petitioners") seek review of a Federal Communication Commission ("FCC" or "Commission") declaratory ruling that it has statutory authority to license certain transmit/receive earth stations to non-common carriers for operational interconnection with the communications satellites of the International Telecommunications Satellite Organization ("INTELSAT").[1] *Declaratory Ruling, In the Matter of Licensing Under Title III of the Communications Act of 1934, as amended, of Private*

---

1. INTELSAT was established by an Executive Agreement signed by the United States and ten other nations in order to promote global telecommunications. *Agreement Establishing Inter-* *im Arrangements for a Global Communications Satellite System,* Aug. 20, 1964, 15 U.S.T. 1705, T.I.A.S. No. 5646, 544 U.N.T. 26.

*Transmit/Receive Earth Stations Operating with the INTELSAT Global Communications Satellite System,* 3 FCC Rcd 1585, 1588 para. 21 (1988) (*"Declaratory Ruling"*). The Commission also ruled that the use of private-line, common carrier circuits to connect a non-common carrier's facilities to an earth station does not in itself convert the earth station into a satellite terminal station, authorizations for which the FCC is to grant in accordance with 47 U.S.C. § 721(c)(7) (1982). 3 FCC Rcd at 1587 para. 16. Because Congress has not addressed either question and the Commission's construction of the statute is reasonable, we deny the petition for review in every respect.

## I. INTRODUCTION

In 1986, Reuters Information Services, Inc., a subsidiary of Reuters Limited (collectively "Reuters"), requested the FCC to issue the challenged declaratory ruling. Reuters provides news, photo, and information services from fourteen data centers— linked together by dedicated, private line international communications circuits—and three technical centers to more than 3,800 locations. Its technical center in Hauppauge, New York, hosts a satellite earth station that is owned and operated by a common carrier.[2] The earth station is used to provide INTELNET II service [3] to Reuters's customers in the Caribbean and Central and South America. It utilizes INTELSAT's International Business Service ("IBS service"), which is capable of providing a wide range of satellite information services to either a large user or to a community of small users. Unlike "multipurpose service," IBS service enables a single satellite transponder to accommodate multiple earth station accesses, and thus has as one of its key features the ability to service small earth stations located at or near the user's premises.

In its request, Reuters noted that there was "at least some question" whether the Commission had authority to license transmit/receive stations to non-common carriers, but asserted that "it makes little sense" to require it to obtain earth station services from a common carrier. *Request for Declaratory Ruling In the matter of Reuters U.S. Inc.,* F.C.C. File No. I–S–P– 86–006 (May 22, 1986) at 3; Joint Appendix ("J.A.") at 44, 48. Before setting out the Commission's response, it will be useful to review briefly the ruling's statutory and regulatory setting.

*A. Background.*

1. Statutory Framework

Title III of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151–611 (1982 & Supp. IV 1986) ("Communications Act" or "1934 Act"), grants broad authority to the FCC to regulate radio communications, including authority to grant a radio license to "any applicant" if the grant will serve the public interest, convenience, and necessity. *Id.* § 307(a). It is undisputed that satellite earth stations with transmission capabilities require Title III radio licenses.

The Communications Satellite Act of 1962, as amended, 47 U.S.C. §§ 701–44 (1982 & Supp. IV 1986) ("Satellite Act" or "Act"), embodies Congress's policy goals on the establishment of an international satellite system, among them serving the communications needs of the United States and contributing to world peace and understanding. *Id.* § 701(a). In order to achieve these goals, Congress provided in Section 201(c)(7) of the Act that the Commission shall "grant appropriate authorizations for the construction and operation of each sat-

---

**2.** When the FCC rendered the challenged ruling, the earth station was owned and operated by Equatorial Communication Services. Equatorial has since been acquired by Contel ASC.

**3.** INTELSAT offers two forms of INTELNET service. INTELNET I provides a one-way transmission from one country via an INTELSAT satellite for reception in one or more other countries. Under INTELNET I, an overseas transmitting signatory acquires space segment (or satellite transponder capacity) from INTELSAT for the uplink, and acquires the downlink from COMSAT. INTELNET II service permits two-way communication between remote terminals and a central point. Significantly, INTELNET II terminals are capable of both transmitting and receiving.

ellite terminal station, either to the corporation or to one or more authorized carriers or to the corporation and one or more such carriers jointly, as will best serve the public interest, convenience, and necessity." 47 U.S.C. § 721(c)(7). The corporation referred to was created by Section 301 of the Act, 47 U.S.C. § 731, and is known as the Communications Satellite Corporation, or more colloquially, Comsat.[4] Although Congress initially vested in Comsat the responsibility of establishing the communications satellite system, in 1964, INTELSAT, a multi-national association, assumed ownership of the system. *Agreement Establishing Interim Arrangements for a Global Communications Satellite System,* Aug. 20, 1964, 15 U.S.T. 1705, T.I.A.S. No. 5646, 544 U.N.T. 26. Comsat remains the sole U.S. member of INTELSAT and manager of the system. *See generally ITT World Communications, Inc. v. FCC,* 725 F.2d 732, 736–37 & n. 4 (D.C.Cir.1984). The Satellite Act provides that in situations where its provisions are "inconsistent" with the provisions of the 1934 Act, the former is to govern. 47 U.S.C. § 741.

### 2. FCC's Prior Rulings on Earth Station Ownership

The Commission first addressed the question of earth station ownership in 1965, in anticipation of the launch of Early Bird, the first of the INTELSAT satellites. *Report and Order, Proposed Global Commercial Communications Satellite System,* 38 F.C.C. 1104 (1965), *reconsideration denied in pertinent part, Memorandum Opinion and Order, Proposed Global Commercial Communications Satellite System,* 2 F.C.C.2d 658 (1966). The FCC licensed the three then-existing earth stations to Comsat alone. Shortly thereafter, the Commission revised its policy so that the existing earth stations (then totalling six) would be jointly owned by a consortium of carriers consisting of Comsat and certain common carriers who provided overseas communications services. *Second*

*Report and Order, Ownership and Operation of Earth Stations,* 5 F.C.C.2d 812 (1966). The Commission designated Comsat manager of the consortium and guaranteed it a fifty-percent ownership share in each earth station. The members of the consortium thereafter entered into the Earth Station Ownership Agreement, which, among other things, established the Earth Station Ownership Committee, or ESOC, to formulate policy and make earth station design decisions. The policy enunciated in 1966 remained in effect until 1984, when in *Report and Order, Modification of Policy on Ownership and Operation of U.S. Earth Stations,* 100 F.C.C.2d 250 (1984), the Commission opted for "a liberalized earth station ownership policy which permits the construction and operation of earth stations outside of ESOC." *Id.* at 265. The practical effect of this "new competitive earth station ownership policy," *id.* at 276, was that common carriers could own and operate earth stations independently, *i.e.,* without Comsat's management and co-control.

### a. International Relay *Ruling.*

Before the Commission modified its earth station ownership policy in 1984, it for the first time licensed exclusively to an individual common carrier an earth station to provide IBS services. *International Relay, Inc.,* FCC No. 84–125 (April 11, 1984), J.A. at 31. The Commission found the rationale supporting its extant earth station policy inapposite to the licensing of earth stations providing IBS as opposed to multipurpose service:

> [I]ndependent carrier ownership of IBS earth stations does not raise the same issues as raised by multipurpose earth stations.... [T]he unique technical characteristics of the IBS offering remove any need for us to evaluate the impact of multiple IBS earth stations on the INTELSAT system.

*Id.* at 8 n. 7, J.A. at 38. Independent carrier licensing was, according to the

---

**4.** Although Comsat is statutorily declared a common carrier, 47 U.S.C. § 741, we note that the term common carrier is usually used to refer to the International Record Carriers, which provide leased-channel (*i.e.,* private lines) and ex-

change services (*i.e.,* common switched network), and AT & T, which provides international voice transmission services. *See generally ITT World Communications, Inc. v. FCC,* 725 F.2d 732, 736–41 (D.C.Cir.1984).

FCC, "consistent with previous Commission decisions favoring the introduction of new and innovative international services." *Id.* at 10, J.A. at 40 (citation omitted). In a companion ruling issued the same day, the FCC granted Comsat's similar application to build and operate independently an earth station which would provide IBS service. *Communications Satellite Corp.*, FCC No. 84–125 (April 11, 1984).

### b. Receive Only *Ruling.*

In 1986, the Commission ruled that earth stations incapable of transmitting signals, "receive-only earth stations," may receive INTELSAT's inbound, or INTELNET I, service without individual licensing or authorization from the FCC. *Declaratory Ruling, Deregulation of Receive–Only Satellite Earth Stations Operating with INTELSAT,* FCC No. 86–214 (May 19, 1986) ("*Receive Only*"), *reprinted in* Brief for Respondent at Attachment. It found that the Satellite Act did not prevent authorization of entities other than Comsat or common carriers to deploy receive-only earth stations for use in connection with INTELNET I service. *Id.* at 6. The Commission reasoned that

> Section 201(c)(7) [governs] . . . substantial earth-station facilities that were expected to be operated as part of common-carrier service offerings. Section 201(c)(7) was not aimed at and does not limit our discretion in deciding the ownership or regulatory treatment of earth stations which have no transmitting capability and which are not connected to a common-carrier network. Congress simply did not address services such as INTELNET I that are designed for direct-to-user transmission and which, accordingly, contemplate the use of small, receive-only earth stations such as those [being considered]. Accordingly, we believe that we have authority [under Title III of the Communications Act] to authorize entities other than Comsat or the carriers to own and use earth stations for inbound INTELNET I service.

Id. at 10 (footnote omitted).

### B. The Challenged Ruling.

The FCC recognized that it had been invited to address a narrow question of law: "Reuters seeks a determination that the Commission has the authority to license private, non-common carrier earth stations for operation with the INTELSAT system under Title III of the Communications Act of 1934, notwithstanding Section 201(c)(7) of the [Satellite Act]. . . ." *Declaratory Ruling,* 3 FCC Rcd at 1585 para. 2. In considering this question, the Commission initially observed that Section 201(c)(7) is not itself a source of licensing authority; rather, the FCC's authority to license satellite earth stations, just as other radio stations, is derived from Title III of the Communications Act, 47 U.S.C. §§ 301–10. *Id.* at 1587 para. 13. Thus framed, the Commission stated the issue to be "whether Section 201(c)(7) limits the Commission's discretion under Title III to grant private international earth station authorizations to 'any applicant.'" *Id.* (citation omitted). The Commission concluded that because the Satellite Act "does not pose such a limitation," it was capable of licensing transmit/receive earth stations for use with INTELNET and IBS services to non-carriers. *Id.*

The Commission determined that Section 201(c)(7) applies only to "satellite terminal station[s]," a term which is defined by Section 103(2) of the Act as a "complex of communication equipment located at the earth's surface, operationally connected with one or more terrestrial communication systems, and capable of transmitting telecommunications to or receiving telecommunications from a communications satellite system." 47 U.S.C. § 702(2). The Commission concluded the Act addresses only "large satellite terminal stations which would be built as part of the global satellite system and which would become an integral part of the terrestrial networks of the U.S. common carriers." 3 FCC Rcd at 1587 para. 15 (citation omitted). Thus, "Section 201(c)(7) only deals with a limited type of earth station," *id.,* and "the Satellite Act does not, nor was it intended to, address private earth stations," which Congress did not foresee as technically feasible. *Id.* at 1588 para. 17.

In the process of declaring its statutory authority to license to non-carriers earth stations that were not covered by the Satellite Act, the FCC determined that "[t]he private international earth station proposed by Reuters is not a 'satellite terminal station' under Section 103(2) or 201(c)(7). It will not be 'operationally connected' with a terrestrial communications system and will not be used to provide common carrier service to the public." *Id.* at 1587 para. 16 (citation omitted). That Reuters would lease private-line circuits from a common carrier would not "alter the private nature of its satellite transmission. It is the use to which the line is put (here, the private business of Reuters) and not the status of the facility's provider (here, common carrier) that determines whether the facility is private or common carrier." *Id.* Additionally, Congress was addressing only those stations which would become an " 'integral part of the domestic network of a common carrier,' " and Reuters's use of carrier-supplied private line did not satisfy this requirement. *Id.* para. 16 & n. 20 (quoting S.Rep. No. 1584, 87th Cong., 2d Sess., at 12, *reprinted in* 1962 U.S.Code Cong. and Admin.News, 2269, 2274). The Commission explicitly refused to make a public interest finding—a necessary predicate to Title III licensing. *Id.* at 1588 para. 21. *See* 47 U.S.C. § 307.

## II. RIPENESS

■ Before reaching the merits of the petition, we must address the Commission's contention that the challenge is not ripe for review under the two-pronged test set forth in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). For both constitutional and prudential reasons,[5] we are required, in appropriate circumstances, "to balance [our] interest in deciding the issue in a more concrete setting against the hardship to the parties

caused by delaying review." *Webb v. Department of Health and Human Services,* 696 F.2d 101, 106 (D.C.Cir.1982). In ripeness parlance, we must determine the fitness of the issues for review and the hardship caused by withholding consideration. *See Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515.

### A. Fitness.

A basic purpose of requiring that a controversy be ripe is to conserve judicial machinery for problems which are real, not to squander it on abstract or remote problems. *See generally id.* at 148, 87 S.Ct. at 1515. There is a distinct institutional interest served by the fitness requirement: It permits the agency to "think[ ] through its policy choices and complet[e] its decisionmaking process before its decision is subjected to judicial review." *Consolidation Coal Co. v. FMSHRC,* 824 F.2d 1071, 1080 (D.C.Cir.1987).

The Commission contends that this case is not fit for review because the ruling merely announces the FCC's statutory authority, and thus it is necessarily "unclear whether such authority will ever be exercised or under what circumstances it will be exercised." Brief for Respondent at 15. It relies principally on our decision in *National Latino Media Coalition v. FCC,* 816 F.2d 785 (D.C.Cir.1987), contending that it presents "a closely analogous situation" to the present case. Brief for Respondent at 11. Although the question may be a close one, we think *National Latino* is distinguishable from the present case. In *National Latino* we were asked to review an FCC pronouncement that "there are no legal or procedural grounds for delaying the use of a tie-breaking lottery" to distinguish among equally deserving applicants for certain licenses. *See* 816 F.2d at 787 (citation omitted). As we char-

---

5. Although ripeness is traditionally regarded as serving the Article III "case or controversy" requirement, we have also previously noted an Article II interest protected by the doctrine. *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 479 (D.C.Cir.1986) (to protect executive from judicial interference during the decisionmaking process). We have previously noted

that it is both difficult and unnecessary to discern the degree to which these underpinnings " 'fade[ ] into persuasive practicalities,' " as the "same result obtains whether the court bases its findings of unripeness on constitutional or prudential considerations." *Id.* n. 8 (quoting *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986)).

acterized the announcement, the FCC "simply stated and explained its view that if any comparative proceeding were to end in a tie, the holding of a tie-breaker lottery 'would not contravene' any part of its governing statute." *Id.* at 788 (citation omitted). In holding the challenge unripe for review, we emphasized the discretionary aspect of the lottery's application, likening the situation to that in *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), where the Supreme Court held that an FDA regulation that permitted (but did not require) certain action was not ripe for review. *Id.* at 163–64, 87 S.Ct. at 1524–25.

In the present case, by contrast, the Commission not only announced its authority, it explicitly rejected the available alternative: provision of services to non-common carriers through a "straw" carrier. *Declaratory Ruling*, 3 FCC Rcd at 1588 para. 19. It also declared that it "will license" non-common carriers through its rules applicable to earth station owners. *Id.* para. 20. Perhaps most important to our analysis in *National Latino* was the possibility that the still theoretical issue might never arise in practice. As was true in one of our recent cases, "[t]he central judicial interest in deferring resolution of th[e] question lies in the possibility that if the issue is not adjudicated at this time, it may not require adjudication at all." *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 235 (D.C.Cir.1988). *See also State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 480 (D.C.Cir.1986) (issue "unfit" for review because the agency action "about which petitioners are vexed will likely never occur"), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). This possibility was particularly acute in both *National Latino* and *Toilet Goods*, as in both cases the agency retained discretion in applying the very aspect of the ruling that was being challenged. *See National Latino*, 816 F.2d at 790 ("the rule indicates only that the Commission *may* hold a lottery to break a tie if one should occur"). Here, by contrast, we find significant the Commission's prior statement, albeit in the context of carrier licensing, that applica-

tions for IBS stations will be processed on a "routine basis." *Report and Order, Modification of Policy on Ownership and Operation of U.S. Earth Stations*, 100 F.C.C.2d at 284. Together with its conclusion in the challenged ruling that non-common carrier licensing will not adversely affect the "economic viability of IBS carriers," *Declaratory Ruling*, 3 FCC Rcd at 1588 para. 19, we are left with the overpowering sense that if the question is not adjudicated at this time, it will be in the not-too-distant future.

Numerous other factors suggest that the challenged ruling is, in fact, fit for review. First, the present controversy raises a purely legal question. Although this alone does not establish fitness, *see Toilet Goods*, 387 U.S. at 163–64, 87 S.Ct. at 1524–25 (1967); *State Farm*, 802 F.2d at 479; *National Latino*, 816 F.2d at 790, the presentation of a purely legal question allows us to "assume its threshold suitability for judicial determination." *Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985) (citations omitted). We can find no indication that "postponing review would provide for a more efficient examination and disposition of the issues." *State Farm*, 802 F.2d at 479 (citing *Toilet Goods*, 387 U.S. at 163–64, 87 S.Ct. at 1524–25). It does not appear that "further administrative action is needed to clarify the agency's position," *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 940 (D.C.Cir.1986), or that the question is not in a " 'concrete and final form,' " *Eagle–Picher Indus.*, 759 F.2d at 915 (citations omitted). There is no contention that the challenged ruling is not "final agency action" within the meaning of the Administrative Procedure Act. *See* 5 U.S.C. § 704 (1982), *see generally Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515 (" 'final agency action' ... includes any 'rule,' defined by the APA as 'an agency statement ... designed to implement, interpret, or prescribe law or policy' ") (quoting 5 U.S.C. § 551(4)). In sum, giving due weight to the interests in judicial economy that are furthered by avoiding unnecessary adjudication, we can see little bene-

fit either to the agency or to the Court in deferring review.

### B.  Hardship of Withholding Review.

While we have in at least two prior cases deemed it unnecessary to reach this prong of the ripeness equation when we have found no judicial or agency interest in deferring review, *see, e.g., Eagle–Picher Indus.,* 759 F.2d at 918; *Consolidation Coal,* 824 F.2d at 1081–82, we typically weigh the institutional interests in postponing review against the hardship delay would cause. *See, e.g., State Farm,* 802 F.2d at 481; *Friends of Keeseville,* 859 F.2d at 235. Having determined that only a minimal interest in postponing review is present, any significant hardship will tip the balance in favor of review.  *Cf. Friends of Keeseville,* 859 F.2d at 236 ("Even where (as here) the governmental interest in withholding adjudication is relatively slight, an issue may nevertheless be unripe if the petitioner's interest in immediate resolution is insignificant.").

We cannot conclude that "petitioner[s'] present status will not be affected by our refusal to adjudicate its claim." *Id.* Rather, as was the case in *Capitol Technical Services, Inc. v. FAA,* 791 F.2d 964 (D.C. Cir.1986), it is reasonable to expect petitioners to suffer a loss of business as a result of the announced policy, *id.* at 969, as their present and prospective customers might reasonably defer contracting.  Reuters, a real party in interest to this petition, must likewise either await Commission licensing, or contract with Contel ASC, which unlike its predecessor, opposes non-carrier licensing.  In light of their adversarial litigation positions, it is not implausible that contract negotiation might be adversely affected. *Cf. Tennessee Gas Pipeline Co. v. FERC,* 736 F.2d 747, 750 (D.C.Cir.1984) (too many "ifs" to make hardship "sufficiently probable").  In short, this is a situation "when contracts must be negotiated," and "primary conduct" is implicated.  *See Toilet*

*Goods,* 387 U.S. at 164, 87 S.Ct. at 1524; *cf. Air New Zealand Ltd. v. CAB,* 726 F.2d 832, 837–38 (D.C.Cir.1984) (no hardship where alleged risk created by agency order appeared too improbable to deter "primary conduct").  On balance, then, the demonstrated hardship outweighs the minimal to nonexistent interest in postponing review. As such, the ruling is ripe for adjudication. *See Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 128 (D.C.Cir.1974) (relevant portion of opinion *en banc* ) (courts "should have a very good reason for indulging" the preference to resolve a particular question at another time and place).

### III.  MERITS

### A.  Challenge to Statutory Authority.

■ Petitioners' fundamental contention is that Section 201(c)(7) of the Act "[e]clusively[ ] [p]rescibes" earth station ownership qualifications, thereby precluding the FCC from licensing a transmit/receive earth station to any entity other than Comsat or another common carrier.  Joint Brief of Petitioners at 19, 31, 35; Reply Brief of Petitioners at 19.  Reuters contends that Section 201(c)(7) is addressed to only a limited type of earth station (*e.g.,* multipurpose earth stations) and does not limit the Commission's Title III authority to license to non-common carriers earth stations providing IBS or INTELNET II service.[6]  In the challenged ruling, the Commission advanced a similar theory:  The Act addresses only "large satellite terminal stations which would be built as part of the global satellite system and which would become an integral part of the terrestrial networks of the U.S. common carriers," and "does not, nor was it intended to, address private stations," which Congress did not foresee as technically feasible.  *Declaratory Ruling,* 3 FCC Rcd at 1587 para. 15, 1588 para. 17 (citation omitted).

To restate the familiar, our review of the Commission's construction of the Act, con-

---

**6.** Reuters also contends that given Congress's silence on the point, the FCC is free to license *any* type of earth station to non-common carriers, subject only to its Title III licensing power. Brief for Intervenor at 10–16.  *See also* Brief for

Respondents at 24 n. 26 ("sole question before Congress ... was who, *as between Comsat and the carriers,* should be licensed").  Because the Commission's ruling can be upheld on a more narrow basis, we need not reach this issue.

gressionally entrusted to its administration, requires that we first ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (footnote omitted). *See also NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (when presented with "a pure question of statutory construction," a court's "first job is to try to determine congressional intent using 'traditional tools of statutory construction' ") (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987)). We turn initially, as we must, to the Act's language.

### 1. Congressional Intent.
#### a. *Language of the Act.*

Section 201(c)(7) requires the Commission to "grant appropriate authorizations for the construction and operation of each *satellite terminal station,* either to the corporation or to one or more authorized carriers or to the corporation and one or more such carriers jointly, as will best serve the public interest, convenience, and necessity." 47 U.S.C. § 721(c)(7) (emphasis added). Section 103(2), in turn, defines "satellite terminal station" in relevant part as "a complex of communication equipment ... *operationally connected with one or more terrestrial communication systems,* and capable of transmitting telecommunications to or receiving telecommunications from a communications satellite system." 47 U.S.C. § 702(2) (emphasis added). Neither "operationally connected" nor "terrestrial communications system" is defined by the Act; nor for that matter was the language part of the version originally passed by the House, H.R. 11040, which defined satellite terminal station as "the complex of communications equipment located on the earth's surface which receives from or transmits to terrestrial communication systems for relay via communications satellites." *See*

H.Rep. No. 1636, 87th Cong., 2d Sess., at 2 (1962). The Senate Committee on Commerce added the language. Although it offered no explanation for the alteration, the Committee stated that "operationally connected" was "intended to include connection by wire or radio between the terrestrial system, on the one hand, and the terminal station on the other hand, whether or not such terminal station is a fixed or mobile station." S.Rep. No. 1584, *supra,* at 14, 1962 U.S.Code Cong. & Admin.News, 2276.

The additional language invites the inference that Congress determined only the ownership rights to a certain class of earth station, namely those that were "operationally connected with one or more terrestrial communication systems." Thus, the argument runs, Section 201(c)(7) does not apply to earth stations that are not "operationally connected with one or more terrestrial communications systems." Stated otherwise, if Congress intended all earth stations to be owned only by Comsat or other common carriers the added language would be rendered superfluous.

The Commission adopted this position in the challenged ruling, concluding that the Commerce Committee Report "made it clear that [terrestrial communications systems] was intended to refer to the 'domestic network of a common carrier.' " *Declaratory Ruling,* 3 FCC Rcd at 1587 para. 14 & 1589 n. 14 (citing S.Rep. No. 1584, *supra,* at 12, 1962 U.S.Code Cong. & Admin.News, 2274). The FCC noted that it had previously held that the phrase "terrestrial communications systems" as used in Section 103(2) "refers to the networks of the then-existing U.S. international common carriers (AT & T and the [International Record Carriers])." *Id.* para. 14 (citing *Memorandum Opinion and Order, Proposed Global Commercial Communications Satellite System,* 2 F.C.C.2d 658, 663 (1966)).

#### b. *Legislative History.*

Relying on the Act's legislative history, petitioners dispute the Commission's conclusion that Congress determined only the

ownership rights of those earth stations that would be an "integral part" of a carrier's terrestrial network. They contend that Congress repudiated the Commission's view by rejecting the common carriers' claim that they should be the exclusive owners of the earth stations. To discern the merit of petitioners' argument, we resort to the Act's rather extensive legislative history.

On February 7, 1962, President Kennedy initiated the legislative process by submitting a proposal to the Congress for the creation of a privately owned communications satellite corporation. The "Administration bill," S. 2814, introduced by Senators Kerr and Magnuson, proposed that the corporation exclusively own and operate the ground stations. *See* S.Rep. No. 1319, 87th Cong., 2d Sess., at 2 (1962). Throughout the Committee hearings the carriers argued that they were in the best position to own and operate the earth stations. Accordingly, the Senate Committee on Aeronautical and Space Sciences amended the bill so that the corporation was not to be the exclusive earth station owner *Id.* at 3. Rather, ownership eligibility was to be granted both to Comsat and to the carriers, and "the Commission should encourage establishment of such stations by the carriers." *Id.* at 5. In so doing, the Committee rejected a proposal by Senator Kefauver and others that would have created the Communications Satellite Authority, an agency of the government that would exclusively own the U.S. portion of the satellite system, ground stations, and tracking system.

While the Senate was considering S. 2814, Representative Harris introduced H.R. 11040, which also provided that the satellite stations could be owned by Comsat, by the common carriers, or by both jointly, with no preference for one over the other. After the bill was passed by the House it was sent to the Senate and referred to the Senate Commerce Committee, which inserted in lieu of its text the text of S. 2814, as amended. The bill was thereafter favorably reported to the Senate floor (retaining the H.R. 11040 designation). *See* S.Rep. No. 1584, *supra,* at 9–10, 1962 U.S. Code Cong. & Admin.News, 2272.

It is at this point that the critical "operationally connected" language first appeared in the legislation. Petitioners offer no possible explanation for its insertion. Nor does our review of the legislative history reveal any congressional design. Indeed, we cannot find in the relevant debates and reports even a single reference to the language that occupies our attention. Rather, Congress's extensive consideration of the Satellite Act[7] focused on the following question: Should the United States participate in the global system through a publicly-owned company, a privately-owned company, the common carriers, or some combination thereof?[8]

In a passage petitioners find critical, the Senate Commerce Committee summarized the controversy:

> During the hearings on this legislation the question of whether the operation of satellite terminal stations by the corporation or the common carriers or a combination of both would best serve the public interest was the subject of extensive discussion. It was urged by some that the common carriers should establish and maintain the ground stations in the United States, *as such facilities would be an integral part of the domestic network of a common carrier* and that the common carriers were directly responsible

---

**7.** Senator Mansfield lamented the Senate's satiated consideration of the bill:

> Today we begin the 15th day of debate on this bill. That and the extensive and exhaustive hearings by five committees and subcommittees add up to an extraordinary consideration of this measure, an extraordinary tolerance of full debate on this measure.

108 Cong.Rec. 16121 (1962).

**8.** Congress also labored on the question of ownership of the corporation. In addition to S. 2814, the Senate also considered a bill, S. 2650, which would have restricted the class of investors in the corporation to the carriers. As originally proposed, S. 2814 provided for joint ownership of the corporation by the carriers and the general public. The ultimate version of H.R. 11040 adopted this approach with certain revisions. *See generally ITT World Communications,* 725 F.2d at 744 n. 27.

for service to the public. To do otherwise, it was contended, would produce divided responsibility in making service available directly to the public.

*Id.* at 12, 1962 U.S.Code Cong. & Admin. News, 2274 (emphasis added). Congress ultimately opted for Comsat, carrier, or joint control, with the Commission showing "no preference" to either Comsat or the carriers and "giv[ing] full consideration to all relevant technological, economic, and operating factors in determining what meets the public interest, convenience and necessity." *Id.* at 18, 1962 U.S.Code Cong. & Admin.News, 2280.

Petitioners argue that because Congress rejected the carriers' claim to exclusive ownership, it thereby rejected their premise that the earth stations would be an integral part of a common carrier network. We believe that this not only reads too much into Congress's rejection of the carriers' claim, but also ignores substantial—and unopposed—evidence in the legislative history that Congress did anticipate that the earth stations would only be operative if connected to the carriers' communications networks. For example, in arguing that the common carriers should not be excluded from owning and operating earth stations, the Chairman of the House Committee on Interstate and Foreign Commerce (Representative Hemphill) expressed an unrebutted understanding of the operational interconnection between earth stations and the common carrier network:

> The earth terminals are comparable to the long-distance telephone switching centers that serve each within the country.... [T]he earth terminals are switching centers which must be operated by crews of skilled people, experienced in the intricate job of switching telephone calls and other communications.... *[The ground stations] will connect the satellite system with the existing communication networks of the carriers on land....* [I]f we take standard communications equipment, normal to the ordinary microwave carrier stations used in the overland communications network today, and add a special

antenna and receiver you then have a satellite microwave ground station.

108 Cong.Rec. 7700–01 (1962) (emphasis added). Uncontradicted hearing testimony likewise indicated that the satellite terminal stations would be connected with the carriers' networks. *See, e.g., Communications Satellite Legislation: Hearings on S. 2650 and S. 2814 Before the Comm. on Aeronautical and Space Sciences,* 87th Cong., 2d Sess., 215 (1962) (statement of Ralph O. Beck of Hawaiian Telephone Co.) (ground station "would be merely an extension of our own terrestrial network of communication facilities"); *Communications Satellite Legislation: Hearings on S. 2814 Before the Comm. on Commerce,* 87th Cong., 2d Sess., 177 (1962) (statement of James E. Dingman of American Telephone & Telegraph Co.) (usefulness of satellite systems "depend[s] upon their proper integration ... in the vast complex of domestic and international common carrier facilities"); *id.* at 183 ("ground stations will be the key to the proper coordination of the communications satellite channels into the domestic network").

Relying on regulations promulgated in 1966, petitioners contend further that the Act does not require an operational connection to a carrier's communications network *at all;* rather, the Act requires only that the station be interconnected with a "terrestrial communications system," which, they contend, can be either a carrier or non-carrier system. Joint Brief of Petitioners at 23. *See* 47 U.S.C. § 702(2). In support of this proposition they cite 47 C.F.R. § 25.103(e), which provides that "[t]he communication-satellite earth station complex [defined in Section 25.103(d) ] interconnects with terminal equipment of common carriers or authorized entities at the interface." Petitioners point to the reference to "authorized entities"—*i.e.,* non-carriers—and argue that this "mak[es] clear that the earth station need not interconnect with a common carrier network—much less be an 'integral part' thereof—in order to be included within the regulatory definition of an earth station." Joint Brief of Petitioners at 23 (citation omitted).

This challenge is misdirected. The regulation in question does not purport to describe the operational connection of satellite terminal stations as defined by Sections 201(c)(7) or 103(2) of the Act. Rather, it describes the interconnection of "communication-satellite earth station complex[es]" defined in Section 25.103(d), or as petitioners tellingly put it: "earth stations." The distinction is not insignificant. At oral argument, counsel for petitioners "had no quarrel" with the notion that there may be earth stations that are not satellite terminal stations within the meaning of Section 201(c)(7). Given this concession, we cannot conclude that because the regulation in question states that a "communication-satellite earth complex" might be operationally connected to an "authorized user," the Commission thereby erred by concluding that a satellite terminal station must be operationally connected to a carrier's network to fall within the ambit of the Act.

To be sure, there are numerous instances in the voluminous legislative history where "satellite terminal station" and "earth station" were treated synonymously. For example, stray comments appear in the record debate of the original Administration bill, S. 2814 [9] and in the discussion of H.R. 11040.[10] We believe it is critical that in none of the above-mentioned illustrations was the speaker purporting to speak to the "operationally connected" language to which we address ourselves.[11] For that matter, S. 2814 never included the critical language in its definition of satellite termi-

nal station, so that any equation of "satellite terminal station" and "earth station" is of marginal relevance to our inquiry. More importantly, we must remember that here, "[a]s always, our inquiry into legislative intent focuses primarily on the language of the statute.... It is, in short, the statute that constitutes law." *Department of Defense Dependents Schools v. FLRA*, 863 F.2d 988, 990 (D.C.Cir.1988) (citation omitted). Given that Section 103(2) would read quite sensibly without the phrase, petitioners' reading would render the operationally connected language a redundancy, an approach we have rejected in an analogous situation. *See ITT World Communications Inc.*, 725 F.2d at 743 & n. 25 ("Congress must have intended [the relevant phrase] to mean something...."). To ignore the Act's express language by treating the phrase as surplusage would be particularly inappropriate where, as here, Congress deemed it important enough not only to include but to add as an amendment to the House version of the bill. As we have said before, the language of the Act "is more than a mere launching pad for a wide-ranging interpretive enterprise by lawyers and judges." *Department of Defense Dependents Schools*, 863 F.2d at 990. True as this is anytime we are called upon to interpret statutory language, it follows *a fortiori* in our first step of *Chevron* review.

In sum, it appears to us upon reading the Act in light of its legislative history that

9.  *See, e.g.,* S.Rep. No. 1319, 87th Cong., 2d Sess. at 3 (1962) ("The administration bill originally provided for 'satellite terminal stations'—i.e., ground stations—to be owned and operated by [Comsat].").

10.  *See, e.g.,* 108 Cong.Rec. 7701 (1962) (comments of Rep. Hemphill) ("In the hearings that have been held in committee concerning ... H.R. 11040, much of the discussion has concerned itself with the ownership of the ground stations—whether it should be the province of the satellite corporation, the carriers, or a combination of the two."); 108 Cong.Rec. 16871 (1962) (comments of Sen. Pastore) ("[I]t may prove in the public interest to have ground stations owned by carriers, by the corporation, or by carriers and the corporation jointly."); *see also* S.Rep. No. 1584, *supra*, at 56, 1962 U.S. Code Cong. & Admin.News, 2314 (Minority

Views) (Contending that "ground stations" should be owned exclusively by Comsat, not jointly with the common carriers: "Only if the corporation owns the ground stations as well as the satellites will it have a communications system."); 108 Cong.Rec. 16240 (1962) (comments of Sen. Kefauver) (quoting the following portion of what would become Section 103(2) of the Act: " 'the term "satellite terminal station" refers to a complex of communication equipment located on the earth's surface,' " and concluding: "That is, ground stations."); *id.* ("either the satellite corporation or one or more authorized carriers may own ground stations").

11.  Indeed, even we, while discussing a different question, treated "earth station" and "satellite terminal station" as coterminous. *See ITT World Communications*, 725 F.2d at 745.

Congress has not addressed the issue of ownership of earth stations *not* operationally connected with a terrestrial communication system. We therefore conclude that *if* Congress expressed a deliberate intent to create an exclusive group of earth station owners, and we stress that we need not decide this question,[12] it appears to have done so only with respect to a certain class of earth station, *i.e.*, those that would be tied to the carriers' network. Petitioners have offered nothing to rebut the Commission's interpretation that Section 201(c)(7) is directed only at earth stations that would be tied to the carriers' domestic network, and not those of more limited size and carrier interconnection, such as those that provide IBS or INTELNET II service.

Petitioners ask us to find that Congress clearly, albeit silently, resolved the ownership rights of non-common carriers to a type of earth station that it did not explicitly consider. To state the proposition is to refute it. Their argument, relying on the force of the implication that arises from the maxim *expressio unius est exclusio alterius*, must fail, given our determination that "Congress has not directly addressed the precise question at issue." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. Because we are unable to discern "the unambiguously expressed intent of Congress," *id.*, we may not "simply impose [our] own construction of the statute," as we might properly do if no agency interpretation were in the picture. *Id.* (citation omitted). Accordingly, we now turn to *Chevron*'s second line of inquiry.

2. **Reasonableness of FCC Interpretation.**

As we have determined that Congress has neither "unambiguously" defined "satellite terminal station," nor precisely addressed the question of who may own and operate earth stations that are "not operationally connected with one or more terrestrial systems," our responsibility shifts to ensuring that the Commission's construction of the Act is a "reasonable one," *Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783, that

is, one that is "rational and consistent with the statute." *United Food & Commercial Workers Union, Local 23*, 484 U.S. at ——, 108 S.Ct. at 421. In order to determine the reasonableness of its interpretation, we look "both to the agency's textual analysis (broadly defined, including where appropriate resort to legislative history) and to the compatibility of that interpretation with the Congressional purposes informing the measure." *Continental Air Lines v. Dep't of Transp.*, 843 F.2d 1444, 1449 (D.C.Cir. 1988).

a. *Textual Analysis.*

In arguing that Congress intentionally provided in Section 201(c)(7) for the continued Title III licensing of stations that are not operationally connected with a carrier's terrestrial network, the Commission contends that "the statute clearly contemplates [such a] category of earth station." Brief for Respondent at 20. Though it later admits that "Congress could not in 1962 have envisioned the possibility of licensing small, private earth stations," *id.* at 24, it need not have contemplated precisely this circumstance. If Congress intended the "operationally connected" language to limit the scope of Section 201(c)(7), it need only to have contemplated the possibility that future technology might produce *some* sort of earth stations that were not operationally connected to a terrestrial communication systems. In that light, we inquire whether the Act will reasonably permit the resolution reached by the Commission. It appears to us that the Commission's reading of the statute, avoiding as it does the negation of the operationally connected language, is a wholly reasonable construction of the Act. *Cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) ("In construing a statute [courts] are obliged to give effect, if possible, to every word Congress used."). Given that the Commission's interpretation of the Act need not be the best or most natural in order to be sustained, we will not casually sweep aside

12. *See supra* note 6 and accompanying text.

the Commission's reasonable interpretation.

Petitioners maintain that to sustain the Commission's interpretation of the Act would be tantamount to "remov[ing] § 201(c)(7) from the Satellite Act by administrative fiat.... If § 201(c)(7) had never been enacted, then the FCC would have had the same discretion it claims this section was intended to confer." Joint Brief of Petitioners at 31–32 (citation omitted). Although one isolated sentence in the ruling may lend support to petitioners' argument,[13] we must nevertheless disagree. We do not understand the ruling to affect the FCC's authority to license satellite terminal stations to Comsat and the other carriers or to determine whether that authority might extend to licensing to other entities.[14]

Petitioners further argue that the Commission's construction of the statute is undermined by the 1978 Amendments to the Satellite Act pertaining to the International Maritime Satellite organization (INMARSAT). International Maritime Satellite Telecommunications Act of 1978, 47 U.S.C. §§ 751–57 (1982). In that Act, which established United States participation in a separate international consortium encompassing maritime as opposed to land-based satellite communications, Congress explicitly vested in the FCC authority to license ownership of "satellite earth terminal stations by persons other than the corporation at any time the Commission determined that such additional ownership will enhance the provision of maritime satellite services in the public interest." 47 U.S.C. § 752(f) (1982). Thus, argue petitioners, Congress "consciously distinguishes between Inmarsat and Intelsat stations in authorizing non-

carrier ownership of the former, but not the latter." Joint Brief of Petitioners at 38. Petitioners' argument simply assigns too great a negative implication to the amendment. Congress may have intended that distinction, or it may simply have been responding explicitly in the later Act to technological information not available in 1962. It may also have seen insufficient reason to amend the Satellite Act by adding an authority which its language did not preclude. Since, even read in the light most favorably to the petitioners' position, the INMARSAT amendments are at best ambiguous, if not silent, on the question before us, petitioners' argument here does nothing to shake the foundations of the *Chevron* analysis heretofore set forth, and the Commission's interpretation will stand.[15]

### b. Compatibility with Congressional Purposes.

In enacting the Satellite Act, Congress was quite forthright in promoting development of the then-nascent satellite telecommunications industry. Section 102 of the Act well expresses Congress's overriding goals: improved global communications responsive to public need, 47 U.S.C. § 701(a), promotion of new and expanded services, *id.* § 701(b), and the injection of "maximum competition" with "the widest possible participation by private enterprise," *id.* § 701(c). *See also id.* § 721(c)(1) (FCC shall "insure effective competition"). Similar considerations are evident in Congress's decision to permit the carriers, along with Comsat, to own earth stations. Expressed most often were three fundamental aims: enhanced system-wide coordination, improved competition, and maxim-

---

**13.** The Commission opined that Section 201(c)(7) "make[s] it clear that we have complete discretion to license 'satellite terminal stations' without Congressional prejudgment." *Declaratory Ruling,* 3 FCC Rcd at 1587 para. 14 (citation omitted). We offer no opinion on the accuracy of this statement, as it is has no bearing on the relevant question answered by the Commission: To whom may the FCC license earth stations that are *not* satellite terminal stations? *See id.* para. 16.

**14.** Because the issue has not been squarely presented, we do not decide whether an earth station owned and operated by Comsat or another carrier might not be a satellite terminal station within the meaning of Section 201(c)(7).

**15.** Petitioners cite a fragment of the legislative history of the INMARSAT amendments as supporting their position. We have reviewed the statement of Representative Murphy, and find that it does not speak to the question before us. *See* 124 Cong.Rec. 36580 (1978).

ized FCC flexibility in questions of ownership. Congress believed that allowing the carriers to share in the ownership of earth stations would advance these objectives.[16] *See* S.Rep. No. 1584, *supra,* at 12–13, 1962 U.S.Code Cong. & Admin.News, 2274 ("the FCC will take into account all relevant technological, economic, operating, and policy factors ... which are related to public interest ... in making its determination as to whom it will authorize to operate the ground stations"). *Cf.* 47 U.S.C. § 157 ("It shall be the policy of the United States to encourage the provision of new technologies and services to the public."). We cannot conclude that the injection of non-carrier ownership does violence to any of these congressional aims.

There is no doubting that Congress contemplated that these broad objectives would be *carried out* by the corporation and the common carriers. But the Declaratory Order noted, as have we, that "[t]here is no indication that Congress conceived of the private, non-common carrier, transmit/receive earth stations under consideration here." *Declaratory Order,* 3 FCC Rcd at 1587 para. 17. It further observed that Congress likewise was unable to conceive of "direct-to-user transmissions, or that earth stations might be small and inexpensive enough for use on customer premises." *Id.* at 1588. The Commission believed these considerations were crucial in determining the inapplicability of Section 201(c)(7). We cannot call this unreasonable.

In discerning the compatibility of the FCC's interpretation with congressional purposes, it is important to note that when, in 1962, Congress was considering the Satellite Act, there existed in the United States two operational earth stations, one owned by AT & T and another owned by IT & T.[17] Congress was advised that such earth stations could only be constructed at costs of as much as four to six million dollars. *See Communications Satellite Legislation: Hearings on S. 2650 and S. 2814 Before the Comm. on Aeronautical and Space Sciences,* 87th Cong., 2d Sess., 301 (1962) (statement of Henri G. Busignies of International Telephone & Telegraph Corp.) (four to six million for "high capacity" earth stations; one to two million for hypothesized "low capacity" stations); *id.* at 66 (statement of Morton J. Stoller of the National Aeronautic and Space Administration) (completed earth station costs "run over 5 million"). We believe that deference is particularly apt in the present case, where the relative infancy of the satellite industry, together with the discretion vested by Congress in the Commission to grant licenses when warranted by public interest, convenience, and necessity, 47 U.S.C. § 307, evidence a congressional delegation of interpretive authority to the FCC. *See generally* Note, *Coring the Seedless Grape: A Reinterpretation of Chevron U.S.A. Inc. v. NRDC,* 87 Colum.L.Rev. 986, 998 (1987) (discussing factors to be considered in determining whether Congress has vested policymaking authority in agency).

Petitioners contend that the FCC's "technology theory" is belied by the legislative history's reference to "mobile" stations, which, petitioners correctly observe, did not

16. Each of these considerations was ably summarized by the Chairman of the House Committee on Interstate and Foreign Commerce. *See* 108 Cong.Rec. 7700–01 (statement of Rep. Hemphill). Among other things, he noted:

If the ground terminals in the United States were owned [exclusively] by the satellite corporation th[e] critical process of coordination would be seriously impaired.

\*    \*    \*    \*    \*    \*

Carrier ownership of ground terminals will build competition into satellite communications.

\*    \*    \*    \*    \*    \*

In drafting our provision on earth terminals, therefore, we have not foreclosed the question of ownership of earth terminals.

Instead, we are maintaining flexibility by placing the power of deciding when, where, and by whom, ground stations shall be provided in the hands of the FCC, which is responsible for the best use of our communications resources.

*Id.*

17. Today, by contrast, INTELSAT services more than 850 earth stations, located in more than 160 countries. E. Binkowski *Satellite Information Systems* 82 (1988) (citing *Intelsat 1985 Yearly Report* 11 (1985)).

exist in 1962. Joint Brief of Petitioners at 25. *See* S.Rep. No. 1584, *supra*, at 14, 1962 U.S.Code Cong. & Admin.News, 2275. We are unmoved. A representative of IT & T specifically informed Congress that it was "presently developing and constructing" two mobile ground stations. *Communications Satellite Legislation: Hearings on S. 2650 and S. 2814 Before the Comm. on Aeronautical and Space Sciences*, 87th Cong., 2d Sess., 289 (1962) (statement of Henri G. Busignies of International Telephone & Telegraph Corp.). Thus, Congress was aware of this emerging technology in 1962. The same cannot be said of the type of stations involved in the present case.

### c. Consistency of Interpretation.

Petitioners contend that the FCC's interpretation is "entitled to little or no deference because the agency has reversed a long-standing precedent without a reasoned analysis." Joint Brief of Petitioners at 16 (citations omitted). In determining the reasonableness of an agency's construction, the Supreme Court has identified "the consistency with which an agency interpretation has been applied" as a relevant consideration. *United Food & Commercial Workers Union, Local 23*, 484 U.S. at —— n. 20, 108 S.Ct. at 421 n. 20. *See also Bowen v. American Hospital Ass'n*, 476 U.S. 610, 646, 106 S.Ct. 2101, 2122, 90 L.Ed. 2d 584 (1986) ("The fact that the agency's interpretation 'has been neither consistent nor long-standing ... substantially diminishes the deference to be given [its] present interpretation of the statute.'") (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 412 n. 11, 99 S.Ct. 2361, 2370 n. 11, 60 L.Ed.2d 980 (1979)). In this regard, it is true, as petitioners point out, that the FCC has previously stated that "[t]he Satellite Act limits the ownership of earth stations to the carriers and Comsat." *Second Report and Order, Proposed Modification of the Commission's Authorized User Policy Concerning Access to the International Satellite Services of the Communications Satellite Corporation*, 100 F.C.C.2d 177, 200 n. 39 (1985). *Accord Memorandum Opinion and Statement of Policy, Authorized Entities and Authorized Users*, 4 F.C.C.2d 421, 424 (1966). It is also true that in the past the Commission has equated "earth station" with "satellite terminal station." *See, e.g., Ownership and Operation of Earth Stations*, 5 F.C.C.2d 812, 814 (1966); *Receive Only*, FCC 86–214, at 4 n. 6 (May 19, 1986). Given that the FCC has never been asked, nor purported to speak to the question of non-carrier earth station ownership, the statements were necessarily rendered in different contexts, and, accordingly, were dicta. Thus, petitioners are incorrect in their contention that the FCC has "consistently held" that an "earth station operating with the Intelsat system could [not] be licensed to a non-carrier." Joint Brief of Petitioners at 8 (citation omitted). Far from so holding, the Commission has never before addressed the question.

Contrary to petitioners' assertions, the challenged ruling is fully consistent with its analogous Commission precedent. In *International Relay, Inc.*, FCC 84–125 (April 11, 1984), J.A. at 31, for example, the Commission determined that its then-existing earth station ownership policy (which required joint Comsat-carrier ownership) was inapposite to the licensing of earth stations providing the newly devised IBS service, concluding that "independent carrier ownership of IBS earth stations does not raise the same issues as raised by multipurpose earth stations." *Id.* at 8 n. 7, J.A. at 38 n. 7. The Commission clearly indicated that stations providing IBS and multipurpose services warrant differing treatment. The proliferation of IBS earth stations, the Commission concluded, "does not raise the same concerns about fragmentation of responsibility and control that prompted our 1966 decision to adopt restrictions against U.S. carriers' individual ownership of U.S. INTELSAT earth stations." *Id.* at 8, J.A. at 40. The FCC also concluded that independent carrier licensing was "consistent with previous Commission decisions favoring the introduction of new and innovative international services." *Id.* at 10, J.A. at 40 (citation omitted).

Petitioners maintain that the present ruling is inconsistent with *International Re-*

*lay* because in that case the Commission concluded that IBS stations "are, indeed, earth stations within the definition of the Satellite Act." Joint Brief of Petitioners at 27. Although the Commission licensed the station "pursuant" to the 1934 Act and "Section 201(c)" of the Satellite Act, nowhere is the question of applicability of Section 201(c)(7) discussed. *See International Relay, supra.* Because the applicant (International Relay, Inc.) was a common carrier, it is likely that the issue was not raised. Thus, an equally tenable interpretation is that the Commission ruled only that licensing the station to a carrier would not be inconsistent with Section 201(c)(7) of the Act. As we have stated earlier, we do not understand the challenged ruling to affect the Commission's authority to license earth stations to either Comsat or the carriers. *See supra* at note 14 and accompanying text.[18]

The FCC's policy of distinguishing between earth stations that provide multipurpose service and those that do not was recently reaffirmed in its *Receive Only* ruling. FCC 86–214 (May 19, 1986). The Commission there ruled that the Satellite Act did not proscribe non-carrier ownership of earth stations that merely receive INTELNET I service. *Id.* at 6. There, as here, the Commission reasoned that Section 201(c)(7) addresses only "substantial earth-station facilities," and concluded that "Congress simply did not address services such as INTELNET I that are designed for direct-to-user transmission and which, accordingly, contemplate the use of small, receive-only earth stations such as those [being considered]." *Id.* at 10.

Undaunted, petitioners assert that *Receive Only* "constitutes no agency precedent in the instant case," since the present case "involves transmit/receive earth stations." Joint Brief of Petitioners at 27 n.

21. While this distinction is real, as far as it goes, nonetheless *Receive Only* is not without precedential value to the present case. Both *International Relay* and *Receive Only* demonstrate the Commission's consistent decisional path of treating earth stations that provide IBS services differently from those that provide multipurpose service, and of interpreting Section 201(c)(7) as governing only earth station facilities that are an integral part of a carrier's domestic network. *See also Modification of Policy on Ownership and Operation of U.S. Earth Stations,* 100 F.C. C.2d at 269 (distinguishing between technical concerns raised by earth stations providing IBS services and those providing multipurpose service). As such, the Commission's interpretation of the Act in the present ruling is consistent and entitled to deference. *Cf. Chevron,* 467 U.S. at 863, 104 S.Ct. at 2791 (most recent of varying EPA interpretations of "source" is permissible and entitled to deference because the agency "consistently interpreted it flexibly —not in a sterile textual vacuum, but in the context of implementing policy decisions in a technical and complex area").

In short, in the challenged *Declaratory Ruling* the FCC advanced "a reasonable explanation for its conclusion" that licensing earth stations to non-common carriers would "serve the ... objectives [in question]." *Chevron,* 467 U.S. at 863, 104 S.Ct. at 2792. Because petitioners' challenge "really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress," *id.* at 866, 104 S.Ct. at 2793, their challenge to the Commission's statutory authority to grant licenses to non-common carriers earth stations that are not satellite stations within the meaning of Section 201(c)(7) of the Act must fail.[19]

---

18. *The same analysis obtains to the Commission's authorization to Equatorial to operate the earth station in question. Order and Authorization, Equatorial Communication Service,* 2 FCC Rcd 1926 (1987). *There, as in International Relay,* the Commission licensed a common carrier to own the station without discussing the applicability of Section 201(c)(7).

19. As was true with the Supreme Court in *Chevron,* we are here confronted with a situation where

> [t]he arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency ..., but one which was never waged in the Congress. Such poli-

## B. *Reuters's Particular Circumstances.*

■ As we noted earlier, in addition to declaring its statutory authority to license to non-common carriers earth stations that were not satellite stations as defined by Section 103(2) of the Act, the Commission also concluded that the private international earth station Reuters proposed is not a satellite terminal station within the meaning of Section 103(2) or 201(c)(7), and, hence, Reuters is not technically ineligible for earth station ownership. 3 FCC Rcd at 1587 para. 16. Reuters's utilization of AT & T private-line circuits would not, the Commission determined, "alter the private nature of its satellite transmission," nor would it alone create the interconnection causing the station to constitute an integral part of the domestic network of a common carrier. *Id.* 1507 para. 16 & 1589 n. 20. The Commission declined to determine whether granting Reuters a license would be in the public interest, a necessary precondition to obtaining a radio license. 3 FCC Rcd 1588 para. 21. *See* 47 U.S.C. § 307.

Petitioners challenge this aspect of the ruling on several fronts, most of which we have already addressed. We here consider petitioners' objection to the Commission's conclusion that Reuters would not be " 'operationally connected' " with a terrestrial communications system because it will "lease private-line circuits to connect its computer center with its proposed private earth station." *Declaratory Ruling,* 3 FCC Rcd at 1587 para. 16. Petitioners maintain that Reuters's " 'private' " lines "are owned by a common carrier and are an operational part of that carrier's communications network," Joint Brief of Petitioners at 10, and that Reuters actually admitted as much in a letter to the Commission, *id.* at 11, 20; Reply Brief of Petitioners at 17.

Preliminarily, the FCC contends that we should not reach this issue because "Reuters' specific communications needs were not pertinent to the Commission's declaratory ruling." Brief for Respondent at 3 n.

2. The Commission argues that because it made no finding that the Reuters system would serve the public interest, "any statement by the Commission to the effect that Section 201(c)(7) would not apply to [the Reuters] proposal was merely dictum." *Id.* at 28 (citation omitted). At oral argument, counsel for the Commission further contended that the discussion of Reuters's circumstances was only by way of "example."

While we must concede that this aspect of the ruling partakes of two possible readings, it is beyond peradventure that the Commission not only explained its ruling on statutory authority with reference to Reuters's circumstances, but, in one respect, extended it. The Commission concluded not only that "[t]he private international earth station proposed by Reuters is not a 'satellite terminal station' under Section 103(2) or 201(c)(7)," 3 FCC Rcd at 1587 para. 16, it added the specific conclusion that a non-carrier would not be ineligible to own an earth station just because it would lease private-line circuits from a common carrier. *See id.* Notwithstanding the Commission's protestations, we will address ourselves to this aspect of the ruling.

The controversy focuses on an exchange of letters between the Commission and counsel for Reuters. While it was considering Reuters's request for the declaratory ruling, the FCC inquired as follows: "Will Reuters' proposed private earth station be connected to a terrestrial common-carrier network (including a domestic or international private line provided by a U.S. common carrier) in any way?" Letter from James L. Ball of FCC to Kenneth E. Hardman (Sept. 12, 1986) (discussing Reuters's request for declaratory ruling), J.A. at 254–55. Reuters responded that the earth station would be interconnected to its news bureaus and picture bureau in various U.S. cities via private line circuits leased from AT & T. Letter from Kenneth E. Hardman and John F. Noble to James L. Ball of FCC (Sept. 19, 1986), J.A. at 257.

■ On this basis petitioners challenge the Commission's conclusion that

cy arguments are more properly addressed to legislators or administrators, not to judges.

*Chevron,* 467 U.S. at 864, 104 S.Ct. at 2792 (footnote omitted).

Reuters would not be operationally connected with a terrestrial communications system. We have already noted that the term "terrestrial communications system" is nowhere defined in the Act and have determined that the Commission could reasonably conclude that Congress intended to address only those earth stations that are operationally connected with a carrier's domestic network. The Commission, apparently drawing on the difference between "private" lines and exchange services (those through the public switched network), concluded that Reuters's use of "a common carrier-supplied private-line to its proposed private earth station would not make that earth station an integral part of a carrier's domestic common carrier network," *Declaratory Ruling*, 3 FCC Rcd at 1589 n. 20, and thus, a satellite terminal station within the meaning of the Act. *Id.* at 1587 para. 16. This conclusion, in light of the Act's ambiguity, and for the reasons we have given above, is reasonable. Nor does it conflict with the Commission's precedent, which, since 1966, has defined the term as referring to the network used by the public. *See Memorandum Opinion and Order, Proposed Global Commercial Communications Satellite System*, 2 F.C. C.2d 658, 663 (1966) (opining that the term "includes the facilities of the terrestrial carriers which pick up traffic from the using public and carry it to the [earth station] and, conversely, receives traffic from the earth station operator for delivery to the public"), *denying reconsideration in pertinent part*, 38 F.C.C. 1104 (1965).[20]

## IV. CONCLUSION

The Commission reasonably concluded that the Satellite Act does not proscribe it from licensing transmit/receive earth stations that are not an integral part of a carrier's domestic network to non-common carriers. For this reason and the additional reasons set forth above, the petition for review is denied.

*So ordered.*

**20.** Petitioners argue that the challenged ruling was procedurally defective because it "made unsupported determinations based upon an inadequate record" and "omitted essential rulemaking proceedings." Joint Brief of Petitioners at 45, 47 (initial capitalization deleted). We disagree. As for their contention that the determinations were based on an inadequate record, the argument is premature. Because the ruling merely declared the FCC's statutory authority and did not license Reuters or any other entity, it need not have acted upon a factual record at all. To the extent that Reuters's circumstances may be different from those described in the ruling, as petitioners contend, they may object, if and when Reuters applies for a license. Petitioners' second claim—that rulemaking was re-

quired—is likewise misplaced. The rules petitioners claim were changed—47 C.F.R. § 25.103 and the "rules which heretofore limited ownership of Intelsat earth stations to carriers and/or Comsat"—as we have explained above, were either not applicable (the former) or non-existent (the latter). Although petitioners claim that the issue would more appropriately be resolved in a rulemaking proceeding, rather than in the "casual, non-confidence generating fashion" chosen by the FCC, Joint Brief of Petitioners at 47, we cannot, absent congressional instruction, impose our own notions of the "best" procedural format. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978).